UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────────────────

MAUREEN P. KRAUSE,

                              Plaintiff,

              v.

BUFFALO and ERIE COUNTY WORKFORCE
 DEVELOPMENT CONSORTIUM, INC.,
BUFFALO and ERIE COUNTY WORKFORCE
 INVESTMENT BOARD, INC.,
JOEL A. GIAMBRA, County Executive of the
 County of Erie, State of New York,
CARL J. CALABRESE, Deputy County Executive
 of the County of Erie, State of New York,
JAMES FINAMORE, Executive Director of the Buffalo
 and Erie County Workforce Investment Board, Inc.,
EUGENE F. BAGEN, Director of Business Services for
 the Buffalo and Erie County Workforce Development
 Consortium,
JAMES F. BRATEK, Director of Information Services &
 Technology for the Buffalo and Erie County Workforce
 Development Consortium, and
RONALD J. BAIA, Director of Greater Buffalo Works,

                              Defendants.

───────────────────────────────────────────

|  |  |
|---|---|
|  | **DECISION**<br>**and**<br>**ORDER**<br>-----------------------------<br>**REPORT**<br>**and**<br>**RECOMMENDATION**<br><br>**03-CV-0730A(F)** |

APPEARANCES:        MARGARET A. MURPHY, ESQ.
                    Attorney for Plaintiff
                    54 Hollywood Avenue
                    Buffalo, New York 14220

                    MAGAVERN, MAGAVERN & GRIMM
                    Attorneys for Defendants Buffalo and Erie County
                     Workforce Development Consortium, Inc.,
                     Buffalo and Erie County Workforce Investment
                     Board, Inc., James Finamore, Eugene F. Bagen,
                     James F. Bratek, and Ronald J. Baia
                    CHERYL SMITH FISHER, of Counsel
                    1100 Rand Building
                    14 Lafayette Square
                    Buffalo, New York 14203

FREDERICK A. WOLF
Erie County Attorney
Attorney for Defendants Joel A. Giambra
 and Carl J. Calabrese
KRISTIN KLEIN WHEATON
Assistant Erie County Attorney, of Counsel
69 Delaware Avenue
Suite 300
Buffalo, New York 14202

## JURISDICTION

This action was referred to the undersigned by Honorable Richard J. Arcara on

February 3, 2004, for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  The matter is presently before the court on a

motion (Doc. No. 13) filed by Defendants Buffalo and Erie County Workforce

Development Consortium, Inc., Buffalo and Erie County Workforce Investment Board,

Inc., James Finamore, Eugene F. Bagen, James F. Bratek, and Ronald J. Baia on

August 12, 2004 seeking to dismiss the Complaint, a motion (Doc. No. 20), filed by

Defendants Joel A. Giambra and Carl J. Calabrese on August 17, 2004, to join in the

motion to dismiss, on motions for summary judgment (Doc. Nos. 30 and 34), filed on

March 22, 2005, respectively by Defendants Buffalo and Erie County Workforce

Development Consortium, Inc., Buffalo and Erie County Workforce Investment Board,

Inc., James Finamore, Eugene F. Bagen, James F. Bratek, and Ronald J. Baia, and by

Defendants Joel A. Giambra and Carl J. Calabrese, and on motions to strike filed by the

County Defendants on June 20, 2005 (Doc. No. 46), and by the Workforce Defendants

on June 21, 2005 (Doc. No. 47).[1]

## BACKGROUND

Plaintiff, Maureen Krause ("Krause"), commenced this action on September 29, 2003, pursuant to 42 U.S.C. § 1983, alleging unlawful employment practice by Defendants.  In particular, Krause claims that Defendants, in violation of the First and Fourteenth Amendments, discriminated against her based on Krause's political beliefs and associations when Krause was not hired for a position with the Greater Buffalo Works ("GBW") program, previously administered by the now defunct Buffalo and Erie County Private Industry Council ("PIC").  Defendants to this action include Buffalo and Erie County Workforce Development Consortium, Inc. ("WDC"), Buffalo and Erie County Workforce Investment Board, Inc. ("WIB"), WIB Executive Director James Finamore ("Finamore"), WDC Director of Business Services Eugene F. Bagen ("Bagen"), WDC Director of Information Services and Technology James F. Bratek ("Bratek"), and GBW Director Ronald J. Baia ("Baia") (collectively referred to as "Workforce Defendants").  Also sued as Defendants are Erie County Executive Joel A. Giambra ("Giambra"), Deputy Erie County Executive Carl J. Calabrese ("Calabrese")[2]

---

[1] Although the motion (Doc. No. 20) filed by Defendants Giambra and Calabrese to join in the motion for summary judgment filed by the remaining defendants to dismiss the Complaint, and the motions to strike (Docs. No. 46 and 47), are nondispositive, while the motions to dismiss the Complaint (Doc. No. 13), and for summary judgment (Docs. No. 30 and 34) are dispositive, the issues in the dispositive and nondispositive motions pending before the court are intertwined and the court thus addresses all such motions together in the interests of clarity and judicial economy.

[2] Since this action was filed, Calabrese has resigned his position as Deputy Erie County Executive, and has been replaced by Bruce Fisher.

(collectively referred to as "County Defendants").[3]  Answers were filed on January 26,

2004 by the County Defendants (Doc. No. 5) ("County Defendants' Answer"), and on

January 29, 2004 by the Workforce Defendants (Doc. No. 6) ("Workforce Defendants'

Answer").  Both the County Defendants and the Workforce Defendants asserted as

affirmative defenses  that Krause's claims are barred by the applicable statute of

limitations.  County Defendants' Answer ¶ 9; Workforce Defendants' Answer ¶¶ 41-45.

On August 12, 2004, the Workforce Defendants moved pursuant to Fed. R. Civ.

P. 12(c) for judgment on the pleadings, arguing the Complaint was untimely filed.  The

motion is supported by the Workforce Defendant's Memorandum of Law (Doc. No. 15)

("Workforce Defendant's Memorandum Supporting Judgment on the Pleadings"), and

the Amended Affidavit of WDC Director of Business Services Bagen (Doc. No. 18)

("Bagen Affidavit") with attached Exhibits A, B and C ("Bagen Affidavit Exhibit __").[4]  On

August 17, 2004, the County Defendants filed a motion to join in the Workforce

Defendants' motion for judgment on the pleadings.  The motion is supported by the

attached Supporting Affidavit of Assistant Erie County Attorney Kristin Klein Wheaton

("Klein Wheaton Affidavit Supporting Joining Motion For Judgment on the Pleadings").

On September 30, 2004, Krause filed in opposition to the motion for judgment on

the pleadings the Affidavit of Maureen P. Krause (Doc. No. 22) ("Krause Affidavit

---

[3] For reasons not stated, Defendants Giambra and Calabrese are sued only in their official
capacity.  As such, should Plaintiff ultimately prevail on her claims at trial, she would be limited to
equitable relief against these Defendants, *i.e.*, reinstatement to her former position as a GBW Program
Coordinator, albeit as a WDC, rather than PIC, employee, and not back wages or benefits.

[4] The Bagen Affidavit was actually filed three times, first on August 12, 2004 (Doc. No. 12),
without exhibits.  When the Bagen Affidavit was refiled on August 12, 2004 with the attached exhibits
(Doc. No. 14), it did not comply with the court's case management/electronic court filing ("CM/ECF")
signature requirements.  Accordingly, the Bagen Affidavit was refiled a second time on August 16, 2004
(Doc. No. 18), containing both the attached exhibits and complying with CM/ECF signature requirements.

Opposing Judgment on the Pleadings"), and a Memorandum of Law in Opposition to

Defendants' Motion to Dismiss (Doc. No. 23) ("Krause Opposition to Judgment on the

Pleadings").  Reply memoranda of law in further support of judgment on the pleadings

were filed on October 15, 2004 by the Workforce Defendants (Doc. No. 25) ("Workforce

Defendants' Reply Supporting Judgment on the Pleadings"), and the County

Defendants (Doc. No. 27) ("County Defendants' Reply Supporting Judgment on the

Pleadings").

On March 22, 2005, Defendants filed motions for summary judgment.  In

particular, the Workforce Defendants moved for summary judgment as to the

Workforce Defendants, filing in support a Statement of Facts (Doc. No. 31) ("Workforce

Defendants' Facts Statement"), with attached exhibits A through H ("Workforce

Defendants' Exh(s). __"), and a Memorandum of Law in Support of Summary Judgment

on Behalf of James Finamore, Buffalo and Erie County Private Industry Council, Inc.,

Workforce Development Consortium, Inc. and Workforce Development Board, Inc.

(Doc. No. 32) ("Workforce Defendants' Memorandum Supporting Summary Judgment").

The County Defendants moved for summary judgment as to the County Defendants,

filing in support a Statement of Facts (Doc. No. 35) ("County Defendants' Facts

Statement"), an Appendix to County Defendants' Statement of Facts (Doc. No. 36),

containing County Defendants' Exhibits A through C ("County Defendants' Exh. __"),

and a Memorandum of Law in Support of Motion for Summary Judgment on Behalf of

Joel A. Giambra and Carl J. Calabrese (Doc. No. 37) ("County Defendants'

Memorandum Supporting Summary Judgment").

On May 27, 2005, Krause filed in opposition to summary judgment a Statement

of Material Facts that Raises Genuine Issues and Precludes Summary Judgment (Doc.

No. 40) ("Plaintiff's Facts Statement"), the Affidavit of Maureen P. Krause (Doc. No. 41)

("Krause Affidavit Opposing Summary Judgment"), the Affidavit of Brian P. McDermott

(Doc. No. 42) ("McDermott Affidavit"), the Affirmation of Margaret A. Murphy, Esq. (Doc.

No. 43) ("Murphy Affirmation Opposing Summary Judgment"), and a volume of exhibits

entitled Plaintiff's Appendix to Local Rule 56.1 Statement of Facts Submitted on Behalf

of Maureen P. Krause (Doc. No. 44), containing Plaintiff's Exhibits A through KK

("Plaintiff's Exh(s). __").

On June 20, 2005, the County Defendants moved pursuant to Fed. R. Civ. P.

37(c) and (d) to strike the McDermott Affidavit and Plaintiff's Exhs. F through JJ, as well

as any references to such documents within Plaintiff's Facts Statement and the Krause

Affidavit Opposing Summary Judgment.  The motion is supported by the attached

Affidavit of Assistant Erie County Attorney Kristin Klein Wheaton ("Klein Wheaton

Affidavit Supporting Motion to Strike"), and exhibits A through D ("County Defendants'

Motion to Strike Exh. __").  On June 21, 2005, the Workforce Defendants moved

pursuant to Fed. R. Civ. P. 37(c) and (d) to strike the McDermott Affidavit and Plaintiff's

Exhs. F through JJ, as well as any references to such documents within Plaintiff's Facts

Statement and the Krause Affidavit Opposing Summary Judgment.  The motion is

supported by the Affidavit of Cheryl Smith Fisher, Esq. ("Smith Fisher Affidavit"),

attached to the notice of motion (Doc. No. 47).

On June 23, 2005, the County Defendants filed the Reply Affidavit of Assistant

Erie County Attorney Kristin Klein Wheaton in Further Support of Summary Judgment

Motion (Doc. No. 48) ("Klein Wheaton Reply Affidavit").  The Workforce Defendants

filed on June 23, 2005, the Reply Affidavit of Cheryl Smith Fisher, Esq., in Further Support of Motion for Summary Judgment (Doc. No. 49) ("Smith Fisher Reply Affidavit"), and the Reply Affidavit of WDC Administrative Director Ronald J. Baia in Further Support of Motion for Summary Judgment (Doc. No. 50) ("Baia Reply Affidavit").

On July 22, 2005, Plaintiff, in opposition to Defendants' motions to strike, filed the Affirmation of Margaret A. Murphy, Esq. (Doc. No. 54) ("Murphy Affirmation Opposing Defendants' Motions to Strike"),[5] attached to which are Exhibits A and B ("Murphy Affirmation Opposing Motion to Strike Exh(s). __"), the Affidavit of Maureen P. Krause (Doc. No. 55) ("Krause Affidavit Opposing Defendants' Motions to Strike"), and the Affidavit of Brian P. McDermott (Doc. No. 56) ("McDermott Affidavit Opposing Defendants' Motions to Strike").   On July 26, 2005, the County Defendants filed the Reply Declaration of Assistant Erie County Attorney Kristin Klein Wheaton in Further Support of Defendants' Motion to Strike (Doc. No. 60) ("Klein Wheaton Reply Declaration Supporting Motion to Strike").  On July 28, 2005, the Workforce Defendants filed the Reply Declaration of Cheryl Smith Fisher, Esq. in Further Support of Defendants' Motion to Strike (Doc. No. 61) ("Smith Fisher Reply Declaration Supporting Motion to Strike").  Oral argument was deemed unnecessary.

Based on the following, the County Defendants' motion (Doc. No. 20) to join in the Workforce Defendants' motion for judgment on the pleadings is GRANTED; the Workforce Defendants' motion (Doc. No.13) to dismiss the Complaint as time-barred should be DENIED; the motions to strike filed by the County Defendants (Doc. No. 46)

---

[5] The Murphy Affirmation Opposing Motions to Defendants' Motions to Strike was refiled on July 25, 2004 (Doc. No. 57) to comply with CM/ECF's signature requirements.

and the Workforce Defendants (Doc. No. 47) are DENIED, the motion for summary

judgment filed by the Workforce Defendants (Doc. No. 30) should be DENIED; and the

motion for summary judgment filed by the County Defendants (Doc. No. 34) should be

DENIED in part and GRANTED in part.

## **FACTS**[6]

Maureen P. Krause commenced employment with the Buffalo and Erie County

Private Industry Council ("PIC") on December 14, 1998, as a Formula Grant Program

Coordinator ("Program Coordinator").  The PIC, a consortium of four local

municipalities, including Erie County, the City of Buffalo and the Towns of Cheektowaga

and Tonawanda, was a private, not-for-profit corporation charged with administering

workforce-training funds under the federal Jobs Training Partnership Act ("JTPA").  The

Program Coordinator position is not a civil service position.  As a Program Coordinator,

Krause's immediate supervisor was PIC Director Bratek, and Krause was supervised on

a daily basis by PIC Director of Planning Marie Kaczmarek ("Kaczmarek").  Krause's

Program Coordinator position was newly created within PIC in 1998.  Prior to assuming

the Program Coordinator position, Krause had held a civil service position with the

Buffalo Municipal Housing Authority.  Krause was offered the Program Coordinator

position after two rounds of interviews with Bratek, Kaczmarek, WIB Executive Director

Finamore, WDC Administrative Director Sam LaGreca ("LaGreca"), former PIC Director

of Finance Russell J. Sferlazza ("Sferlazza"), and Director of Buffalo Employment and

---

[6] Taken from the pleadings and motion papers filed in this action.

Training Services Colleen Cummings ("Cummings").

As a Program Coordinator, Krause's duties included implementing the federal welfare-to-work ("WTW") grant program, referred to as Greater Buffalo Works ("GBW"), and which was funded by the U.S. Department of Labor and jointly administered by the PIC and the Erie County Department of Social Services.  Edith Rifenburg, another Program Coordinator, worked with Krause in implementing the WTW program.  When Krause was initially offered the Program Coordinator position, she was advised by Bratek and Kaczmarek that she had a job commitment with the program for the three-year duration of the grant.  Krause also maintains Bratek stated that PIC had applied for another three-year grant and, if approved, Krause's Program Coordinator position would be extended for the three additional years.  According to Krause, the GBW was approved for the second three-year grant.

Krause, a life-long registered Democrat, has been an Erie County Democratic Committee person since 1979 and, in 1999 and at the request of then Deputy Erie County Executive James P. Keane, a Democrat, worked on the re-election campaign of then Erie County Executive Dennis Gorski ("Gorski"), also a Democrat.  In November 1999, Gorski was defeated in his re-election bid by the Republican candidate, Giambra, who assumed the Erie County Executive post in January 2000.

On July 1, 2000, the federal Workforce Investment Act ("WIA") replaced the JTPA as the country's principal federal job-training program, and the WDC was designated as WIA's administrative entity in Erie County.  Because the WDC was not staffed and fully functional as of July 1, 2000, PIC was contracted with to provide WIA with administrative services through October 1, 2000, while WDC staff were recruited

and hired.

On July 25, 2000, Bratek, then PIC Director, sent letters to all PIC employees
(the "July 25, 2000 Bratek Letter"),[7] advising that PIC would "cease to provide services
on September 30, 2000," on which date the jobs of all PIC employees would be
terminated and that the resulting lay-offs would be permanent given that PIC would no
longer exist.  PIC employees were also encouraged to apply for positions with the
replacement workforce development system, *i.e.*, WDC.  July 25, 2000 Bratek Letter.

In August 2000, Krause submitted her resumé for the recently posted positions
of WDC Director and Program Coordinator, a position essentially identical to Krause's
position as GBW Program Coordinator with PIC.  According to the job posting, both the
Director and Program Coordinator positions required either a bachelor's degree and five
years of management or supervisory experience in the workforce development field, or
a master's degree and three years management or supervisory experience in the
workforce development field.

During the week of September 11, 2000, Bagen went to the GBW office to
conduct interviews for the positions being transferred from PIC to WDC.  According to
Krause, Bagen walked around the office speaking to various PIC staff members and
informing them whether they were "on or off the list."  Complaint ¶ 30.  Although Bagen
scheduled "interviews" with selected staff members, Krause maintains that upon
reporting for the interviews, Bagen advised the selected staff members that "it isn't
really an interview," and that the employee should report to work on Monday, October 2,

---

[7] Workforce Defendants' Exh. C.

2000.  Complaint ¶ 30.  Despite possessing the specified education and experience requirements for both positions, and given her experience, since December 1998 as the GBW Program Coordinator as a PIC employee, Krause was not selected to interview for, nor offered, either position with WDC, nor was Krause ever told why she was not considered for either position.

Rather, Baia, a registered Republican, was hired for the Director position, and Anthony A. Marconi, although a Democrat, a known friend and political ally of Giambra, and Rifenburg, a registered Republican, were hired for the Formula Grant Program Coordinator positions.  Krause maintains that neither Marconi nor Rifenburg possessed the minimum education and experience requirements as specified in the postings for the Program Coordinator positions.  Krause last reported to work at her Program Coordinator position on Friday, September 29, 2000.  PIC ceased operations on Saturday, September 30, 2000 and, on Monday, October 2, 2000, WDC had assumed operation of GBW.

According to Krause, seven GBW staff members, all Democrats, lost their jobs following the phase-out of PIC, and all seven were replaced by non-Democrats. Complaint ¶ 32.  Krause maintains that "it was common knowledge that all new hires [for WDC and WIB positions] went through the County Executive's Officer for final approval.  Calabrese, the newly appointed Deputy County Executive, was the liaison between the two offices."  Complaint ¶ 23.  Krause further maintains that in late spring of 2000, Bratek presented Krause with a list of four individuals, all either registered Republicans or Conservatives and all politically connected to the newly elected Giambra administration including at least one relative of Giambra, whose names came

directly from Giambra's office, who were to be hired to fill vacancies with WDC and

WIB, and that when Krause advised Bratek that many of the individuals lacked the

qualifications specified in the relevant job descriptions, Bratek replied that if he and

Krause "cooperated with the 'new administration,' they might be able to save their jobs."

Complaint ¶ 23.  Krause responded by asking Bratek about her own job security and

Bratek replied that "'the only thing' that could jeopardize her job was her friendship with

James P. Keane, the former Deputy County Executive."  Complaint ¶ 25.


## DISCUSSION

### 1.   Judgment on the Pleadings

The Workforce Defendants moved for judgment on the pleadings, arguing that

Krause's claim is time-barred because the Complaint establishes that Krause had

enough information to know of Defendants' alleged discriminatory employment

practices more than three years before commencing the instant action.  Workforce

Defendants' Memorandum Supporting Judgment on the Pleadings at 7.  The County

Defendants have moved, pursuant to Fed. R. Civ. P. 10(c) to join in the motion.  County

Defendants' Notice of Motion and Motion to Join and Adopt Defendants' Motion to

Dismiss.

The court initially addresses the County Defendants' motion to join the

Workforce Defendants' motion for judgment on the pleadings.  The County Defendants'

motion is made pursuant to Fed. R. Civ. P. 10(c) ("Rule 10(c)") which provides that

"[s]tatements in a pleading may be adopted by reference in a different party of the

same pleading or in another pleading or in any motion.  A copy of any written

instrument which is an exhibit to a pleading is a part thereof for all purposes."  Rule

10(c), however, provides no authority for one party to adopt by reference the arguments

advanced by another party in a motion in which the first party seeks to join.  Rather,

where a motion to join is unopposed, the arguments proffered by the defendant

initiating the motion apply equally to all co-defendants, and granting the motion to join

will not prejudice the plaintiff, the motion to join is generally granted.  *See Gulf Coast*

*Development Group, LLC v. Lebror*, 2003 WL 22871914, *1 n. 1 (S.D.N.Y. 2003)

(observing that where co-defendant moved to join in defendant's motion to dismiss, yet

failed to present any "individualized arguments to the Court on his behalf," co-defendant

would be included in any general rulings on the motion, but would not be individually

considered on the motion); and *Sacay v. Research Foundation of City University of*

*New York*, 44 F.Supp.2d 505, 509 (E.D.N.Y. 1999) (granting co-defendants' motion to

join defendants' motion for judgment on the pleadings as the arguments defendants

made in support of motion equally applied to co-defendants and permitting co-

defendants to join would not result in any prejudice to plaintiff).

   Krause has not opposed the County Defendants' motion to join in the Workforce

Defendants' motion for judgment on the pleadings.  As the Workforce Defendants'

motion for judgment on the pleadings is predicated on the assertion that Krause's claim

is time-barred, the arguments the Workforce Defendants assert in support of the motion

apply equally to the Workforce Defendants and the County Defendants.  Significantly,

both the Workforce Defendants and the County Defendants assert expiration of the

applicable statute of limitations as an affirmative defense.   County Defendants' Answer

¶ 9; Workforce Defendants' Answer ¶ 41-45.  As such, the County Defendants did not

waive the statute of limitations as an affirmative defense, *see* Fed. R. Civ. P. 12(b)

(specifying that "[e]very defense, in law or fact, to a claim for relief in any pleadings,

whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the

responsive pleading thereto . . . ."), and the court's determination as to whether

Krause's claim is time-barred will therefor apply equally to the Workforce Defendants

and the County Defendants.  Finally, permitting the County Defendants to join in the

motion for judgment on the pleadings will not result in any prejudice to Krause.

Accordingly, the County Defendants' motion to join the Workforce Defendants'

motion for judgment on the pleadings is GRANTED.  The court next turns its attention

to the merits of the motion seeking judgment on the pleadings on the basis that the

instant action is time-barred.

Upon a motion for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c)),

the court must follow the same standards applicable to a motion under Rule 12(b)(6).

*Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1993),  *cert. denied*, 115 S.Ct. 73

(1994).  On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court looks to the

four corners of the complaint and is required to accept the plaintiff's allegations as true

and to construe those allegations in the light most favorable to the plaintiff.  *Scheuer v.*

*Rhodes*, 416 U.S. 232, 236 (1974); *Village Pond, Inc. v. Town of Darien*, 56 F.3d 375,

378 (2d Cir. 1995), *cert. denied*, 519 U.S. 808 (1996).  The court is required to read the

complaint with great generosity on a motion to dismiss.  *Yoder v. Orthomolecular*

*Nutrition Institute*, 751 F.2d 555, 558 (2d Cir. 1985).  The complaint will be dismissed

only if "it appears beyond doubt" that the plaintiff can prove no set of facts which would

entitle him to relief.  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Goldman v. Belden*,

754 F.2d 1059, 1065 (2d Cir. 1985).  This rule applies with particular force where the plaintiff alleges a civil rights violation.  *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

Krause alleges Defendants violated her civil rights under 42 U.S.C. § 1983. Pursuant to § 1983, an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States.  42 U.S.C. § 1983.  However, "Section 1983 'is not itself a source of a substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).  Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed."  *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 394, (1989); and *Baker*, *supra*, at 140).  Here, Krause's employment discrimination claim alleges a violation of the First Amendment right to free association.  *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003) ("Affiliating oneself with a political party or faction is [ ] protected by the First Amendment."); *Notaro v. Giambra*, 2005 WL 711875, *7 (W.D.N.Y. March 28, 2005) ("the failure to promote, transfer, or recall a low-level public employee after layoffs based on his or her political affiliation is an impermissible infringement on First Amendment rights.") (citing *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 76 (1990) (failure to hire based on political affiliation)).

"In section 1983 actions, the applicable limitations period is found in the 'general or residual [state] statute [of limitations] for personal injury actions.'"  *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50

(1989)).  In New York, a three-year statute of limitations governs unspecified personal

injury actions.  *Ormiston*, *supra*, at 71 (citing New York Civil Practice Laws and Rules §

214(5)).  Accordingly, the instant § 1983 action is subject to a three-year statute of

limitations.  *Ormiston*, *supra*, at 71.  The three-year limitations period also applies to

actions against municipalities for wrongful conduct, rather than New York General

Municipal Law § 50-i(1) (specifying a one-year, 90-day limitations period for actions

against municipalities for wrongful conduct)).  *Singleton v. City of New York*, 632 F.2d

185, 189 (2d Cir. 1980).  Federal law, however, governs the determination of the

accrual date for statute of limitations purposes in a § 1983 action.  *Id*. (citing *Eagleston*

*v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994), *cert. denied*, 516 U.S. 808 (1995).

Under federal law, the limitations period accrues "when the plaintiff knows or has

reason to know of the injury that is the basis of the action."  *Cullen v. Margiotta*, 811

F.2d 698, 725 (2d Cir. 1987); *see also Singleton*, *supra*, 632 F.2d at 191 (the statute of

limitations accrues "when the plaintiff knows or has reason to know of the injury which is

the basis of his action.") (internal quotation marks omitted).

        To survive a motion for judgment on the pleadings, a § 1983 plaintiff alleging

unlawful employment practice against her former municipal employer, whose claim

would be time-barred if it accrued prior to the termination of her employment with the

municipality, must plead facts indicating she did not comprehend the nature of her

circumstances until after the final date of her employment.  *See Ormiston*, *supra*, at 72

(stating that § 1983 plaintiff asserting deprivation of liberty, whose claim would be time-

barred if it accrued at the time of confinement, was required to plead facts indicating the

plaintiff was unable to comprehend the nature of his circumstances when he was taken

16

into custody).   "The crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action.").  *Singleton*, *supra*, at 192.

That evidence outside the pleadings on which Krause relies in opposing the motion for judgment on the pleadings is not, as the Workforce Defendants suggest, Workforce Defendants' Reply Memorandum Supporting Judgment on the Pleadings at 1-2, inapplicable.  Rather, when matters outside the pleadings are relied on with regard to either a motion to dismiss brought under Rule 12(b) or for judgment on the pleadings brought under Rule 12(c), the correct procedure is to treat the motion as one for summary judgment.  Fed. R. Civ. P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and dispose of it as provided under [Fed. R. Civ. P.] 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.")

In the instant case, although the court has not specifically notified the parties that the motion for judgment on the pleadings is being converted to a motion for summary judgment, the conversion does not result in prejudice to Krause insofar as the court is recommending the motion for judgment on the pleadings be denied.  Moreover, as Defendants have separately moved for summary judgment, all parties are on notice that the claims are before the court on motions seeking a decision that may be dispositive of the action in its entirety.  *See Sira v. Morton*, 380 F.3d 57, 68 (2d Cir. 2004) (court's failure to notify parties prior to converting motion for judgment on the pleadings to motion for summary judgment did not prevent parties from filing further motions for

17

summary judgment on same issue for which judgment on the pleadings was sought). The court thus considers the motion for judgment on the pleadings as a motion for summary judgment.

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Tenenbaum v. Williams*, 193 F.3d 58, 59 (2d Cir. 1999) (citing *Anderson, supra*, at 255).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex, supra*, 477 U.S. at 322; *see Anderson, supra*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). In assessing a record to determine whether there is genuine issue of material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought.  *Rattner*, *supra*, 930 F.2d at 209.

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'

Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex, supra*, at 323-24 (1986) (quoting Fed. R. Civ. P. 56).  Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case."  *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).

Although a summary judgment motion may be made with or without supporting affidavits, if affidavits are submitted, they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(a).  Rule 56 further provides that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

"However, if the motion for summary judgment is not made and supported as provided

in Rule 56, the Rule does not impose on the party opposing summary judgment an obligation to come forward with affidavits or other admissible evidence of his own." *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000) (reversing granting of summary judgment in favor of defendant because defendant failed to allege factual basis for assertions contained in defendant's affidavit such that plaintiff, as the party opposing summary judgment, was not required to adduce evidence to defeat summary judgment and the "self-serving" nature of plaintiff's affidavit statements went to the weight of the statements, rather than to their admissibility).

Here, Defendants maintain that Krause's claims accrued more than three years before she commenced the instant action on September 29, 2003.  Specifically, although Krause's last day as Program Coordinator was September 29, 2000, Defendants assert Krause's claim accrued as early as September 11, 2000 when Bratek visited GBW's office and invited certain employees, but not Krause, to interview for GBW positions with WDC, including the Program Coordinator position for which Krause had applied, or by September 20, 2000 when Baia was hired for the Director position for which Krause had applied, or by September 25, 2000, when both Marconi and Rifenburg were hired for the Program Coordinator positions.  Workforce Defendants' Memorandum Supporting Judgment on the Pleadings at 8.  Defendants also maintain that the speculation and rumors circulating as early as the Spring of 2000, as alleged in the Complaint, provided Krause with enough knowledge to realize her political party affiliation rendered her a likely target for replacement by someone who supported the new Giambra administration.  Workforce Defendants' Reply Memorandum Supporting Judgment on the Pleadings at 2-3 (citing Complaint ¶¶ 22-24,

28-30).

Defendants argue that although Krause's last day of employment with PIC as GBW's Program Coordinator was September 29, 2000, sufficient information existed such that Krause knew or had reason to know prior to September 29, 2000, of Defendants' alleged scheme to discriminate against former PIC employees based on their political beliefs and affiliations.  Workforce Defendant's Memorandum Supporting Judgment on the Pleadings, at 6; County Defendants' Reply Supporting Judgment on the Pleadings at 2.  The cases on which Defendants rely in support of their position, Workforce Defendants' Memorandum Supporting Judgment on the pleadings at 3-11; Workforce Defendants' Reply Supporting Judgment on the Pleadings at 2-4; County Defendants' Reply Supporting Judgment on the Pleadings at 2, however, are inapposite as in each of the cited cases, although the plaintiff's employment discrimination claim was found to have accrued when the plaintiff first received notice that his employment was being terminated, in none of the cases did the circumstances suggest that the plaintiff may be rehired.  *See Keating v. Carey*, 706 F.2d 377, 382 (2d Cir. 1983) (employment discrimination claim accrued in July 1975 when plaintiff was advised he would be terminated from his employment with the Division of Criminal Justice Services based on plaintiff's membership in the Republican party, rather than on September 3, 1975, the plaintiff's last actual day of work); *Pauk v. Board of Trustees of the City University of New York*, 654 F.2d 856, 859 (2d Cir. 1981) (plaintiff's cause of action for unlawful employment discrimination challenging defendant's failure to grant plaintiff tenure, allegedly because of plaintiff's active participation in the faculty's union, accrued on October 24, 1975 when plaintiff was initially notified that defendant had voted

21

against plaintiff's reappointment with tenure, rather than on August 31, 1976, the date that plaintiff's employment was terminated); *Singleton*, *supra*, 632 F.2d 185, 191 (plaintiff's claims for assault and for false arrest accrued when plaintiff was arrested which "was the time at which plaintiff knew of his injury arising from the alleged assault and false arrest"); *DeVito v. Incorporated Village of Valley Stream*, 991 F.Supp. 137, 140 (E.D.N.Y. 1998) (plaintiff's claim that he was forced to resign from his employment position with defendant village in violation of his civil rights under § 1983 based on plaintiff's support of incumbent Republican administration which was defeated in 1991 election accrued when plaintiff was offered retirement in September 1991, in lieu of being brought up on disciplinary charges which could result in the forfeiture of plaintiff's retirement benefits, rather than on the last day of plaintiff's employment on November 29, 1991, as plaintiff's subsequent retirement was the "inevitable consequence" of the decision previously made in September 1991); and *Eisert v. Town of Hempstead*, 918 F.Supp. 601, 607  (E.D.N.Y. 1996) (employment discrimination claims brought by plaintiffs, members of the Democrat party, who took civil service examination to apply for position working as Defendant Town's Commissioner of Purchasing and who were later interviewed for such position during which plaintiffs were questioned as to their political affiliation, accrued on day plaintiffs received letter from Town informing they had not been selected for position and that the statute of limitations had not been tolled until February 1992 when one of the plaintiffs read a report regarding the Town's politically corrupt hiring practices).  Significantly, in none of the above cases did the circumstances surrounding the termination of the plaintiff's employment include an indication that the plaintiff might be rehired, nor a claim based on such prospective

hiring for a newly created position with a different, albeit successor, agency.

In contrast, in the instant action, Krause's employment claim is not predicated on Defendants' decision to discharge all the PIC employees, including Krause, when PIC was replaced by WDC as GBW's administrative entity but, rather, her claim is predicated on Defendants' failure to consider her for and provide her with an opportunity to interview for either of the two WDC positions, including GBW Director and GBW Program Coordinator, for which Krause had applied, despite the fact that Krause, objectively, possessed the requisite education and experience.  As such, Krause's claim could not accrue until Krause knew, or reasonably should have known, that she would not be considered for any of the positions for which she had applied.  In fact, Defendants acknowledge, Workforce Defendants' Memorandum Supporting Judgment on the Pleadings at 8-9; County Defendants' Reply Supporting Judgment on the Pleadings at 1, that because Krause's employment was terminated in connection with the dissolution of PIC, which involved the termination of employment of all former PIC employees, the termination of Krause's employment alone cannot sustain her employment discrimination action based on her political affiliation.  Additionally, Krause make several assertions in opposition to the motion to dismiss that raise issues as to whether Krause was actually aware prior to her last day of employment with PIC on September 30, 2000 that she was not being considered for the GBW Program Coordinator position, none of which are disputed by Defendants.

Specifically, Krause asserts in opposition to the motion for judgment on the pleadings that upon being hired for the GBW Program Coordinator position with PIC in December 1998, Krause was advised that the position was funded for three years, and

that PIC had applied for another "round of funding" which, if approved, would be extended for an additional three years.  Krause Affidavit Opposing Judgment on the Pleadings ¶ 4.  When Marie Kaczmarek, who supervised Krause on a daily basis, learned that, because of a change in the underlying federal funding, PIC's functions were to be phased out and transferred to the WDC and the WIB, she indicated to Krause that the transition would have no impact on GBW.  *Id*. ¶ 7.

Additionally, the July 25, 2000 Bratek Letter advising all PIC employees that PIC would cease to provide services on September 30, 2000, and, as a result, all PIC employees would be laid off as of September 30, 2000, also advised that he was "hopeful that the new workforce development system [would] soon begin the process of selecting and hiring staff," and urged PIC employees "to apply for employment with the new  entities."  *Id*. ¶ 8 (citing July 25, 2000 Bratek Letter).  When the GBW positions were posted in August 2000, Krause submitted her resumé for the Director and Program Coordinator positions, confident, based the July 25, 2000 Bratek Letter and Kaczmarek's representation, that she would at least be interviewed for the Program Coordinator position given her experience and the favorable comments and work reviews she received while employed in that position.  *Id*. ¶ 9.  Krause further explains that although she was told that Bagen had visited the GBW's offices during the week of September 11, 2000, and informed people whether they had been selected to be interviewed for GBW positions after the transition, Bagen never stopped by her office and Krause was not aware that any of the candidates Bagen selected to interview had applied for either the Director or Program Coordinator position.  *Id*. ¶ 11.  According to Krause, despite the gossip and speculation among her co-workers that Krause "would

be politically targeted for removal," no one with any supervisory authority ever advised Krause that she would not be considered for either position. *Id.* ¶ 12.  In fact, when Krause left her position on September 29, 2000, she was unaware that the Program Coordinator position had been filled. *Id.* ¶ 13.  Moreover, prior to September 29, 2000, Krause was asked to speak at an employment seminar on October 1, 2000 and, believing that she would be re-hired to the same GBW Program Coordinator position with WDC, Krause accepted the speaking engagement invitation[8] on behalf of GBW, notifying Bratek by facsimile transmission of her acceptance. *Id.* ¶ 14.  Krause sent a second fax to Bratek a few days before the termination of her employment with PIC, inquiring whether she should attend the employment seminar on GBW's behalf, requesting notification by September 30, 2000, but no response was ever received. *Id.* It is significant that Defendants do not contest any of Krause's assertions.

Further, although Bratek states that he visited the GBW's offices at PIC during the week of September 11, 2000 to interview PIC employees for positions with WDC, Bagen Affidavit ¶ 3, Bagen does not state whether or not he informed Krause that she was not selected as a candidate for either the GBW Director or Program Coordinator positions for which she had applied with WDC.  Bagen further states that Baia was advised by letter dated September 19, 2000 that he was hired as GBW's Director, and that Marconi and Rifenburg were advised by letters dated September 25, 2000 that they were hired as GBW's Program Coordinators.  Bagen Affidavit ¶ 2 and Exhs. A, B and C.  Although Krause does not discuss whether she was aware, prior to September 30,

---

[8] The record does not identify who extended the invitation to Krause to speak at the October 1, 2000 employment seminar.

2000, that Baia had been hired for the GBW Director position, it is entirely possible that Krause may not have been aware that the GBW Program Coordinator positions had already been filled, given that the letters from Bagen notifying the candidates they had been selected for the positions were dated September 25, 2000, Bagen Affidavit ¶ 2, only a few days prior to September 29, 2000, and one of the persons hired for one of the positions, Marconi, was not then employed by GBW and, thus, not a potential source of gossip.  In fact, nowhere within the record is there any indication that anyone ever bothered to inform Krause that the GBW Director and Program Coordinator positions had been filled, or that she was not being considered as a candidate for any such positions as of a particular date prior to September 29, 2000.[9]

Construing these facts in the light most favorable to Krause demonstrates the existence of a genuine issue of fact as to whether Krause knew, or should have known, prior to September 29, 2000, that she would not be considered for further employment with GBW, based on her political association or otherwise.

The County Defendants further argue that Krause, once she was aware of the basic facts of her injury, was also "under an obligation to exercise due diligence in pursuing her claim," citing *Kronisch v. United States*, 150 F.3d 112, 122 (2d Cir. 1998), in support.  County Defendants' Reply Supporting Judgment on the Pleadings at 2.  In *Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998), the Second Circuit upheld summary judgment against a plaintiff who failed to commence an action under the Federal Tort Claims Act ("FTCA") more than six years had elapsed since he formed the

---

[9] Nowhere in the record do the parties state whether Defendants directed Krause to remove any personal items from her office before leaving work on September 29, 2000, a fact from which the jury could find that Krause truly believed she would be returning once she was rehired as a WDC employee.

belief that his injury was caused by his exposure to LSD in the 1950's as part of a clandestine government approved experiment.  The court stated that while neither "a mere hunch, hint, suspicion or rumor of a claim" is sufficient for a cause of action to accrue, they "do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence."  *Kronisch, supra*, at 121 (emphasis added) (citing *Hobson v. Wilson*, 737 F.2d 1, 35 & n. 107) (emphasis added).  The court held that had the plaintiff exercised reasonable diligence by making relevant inquiries, he would have discovered the cause of his injuries soon enough to timely commence an  action.  *Kronisch*, *supra*, at 124.

The Second Circuit, however, has been hesitant to extend the "duty to inquire" applied in *Kronisch* to claims other than those asserted under the FTCA.  Specifically, in *Frier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 205-06 (2d Cir. 2002), the Second Circuit vacated the District Court's determination that personal injury and wrongful death claims brought on behalf of plaintiff's decedents were time-barred because the District Court "apparently accepted defendants' contention that a reasonable suspicion that an injury may be been caused by exposure to toxic or hazardous substances is sufficient to trigger a rule of limitations that is predicated on knowledge of a fact or event."  The Second Circuit, however, completely ignored the District Court's actual finding that, under *Kronisch*, "plaintiffs were obligated, upon discovering they had cancer, to investigate to determine the cause of such injuries," and that as sufficient information was available more than three years before the action was commenced, had plaintiffs undertaken a timely investigation as to the cause of their cancers, they would have been able to commence the action more than three years prior to the date

the complaint was filed.  *In re Pfohl Brothers Landfill Litigation*, 68 F.Supp. 236, 253

(W.D.N.Y. 1999).  The Second Circuit's holding in *Freier*, *supra*, thus indicates an

unwillingness to expand *Kronisch*'s holding that although "[a] claim does not accrue

when a person has a mere hunch, hint, suspicion, or rumor of a claim, such suspicions

do give rise to a duty to inquire into the possible existence of a claim in the exercise of

due diligence," *Kronisch*, *supra*, at 121, to claims that arise under laws other than the

FTCA.  Accordingly, in the instant case, neither Krause's suspicions, nor the rumors

she heard that PIC employees who were registered Democrats were being targeted for

replacement should be held to have triggered any duty for Krause to investigate as to

the stability of her employment with GBW or her prospect of employment with WDC.

Accordingly, the motion to dismiss the Complaint as time-barred should be

DENIED.


**2.**   **Motion to Strike**

Defendants move to strike certain papers filed by Krause in opposition to the

motions for summary judgment, including the McDermott Affidavit (Doc. No. 42),

Plaintiff's Exhs. F through JJ, and any portion of Plaintiff's Facts Statement (Doc. No.

40), referencing the McDermott Affidavit or Plaintiff's Exhs. F through JJ, and any

portion of the Krause Affidavit Opposing Summary Judgment (Doc. No. 41), referencing

information that Defendants maintain should have been, but was not, turned over in

discovery, pursuant to Fed. R. Civ. P. 37(c) and (d).  The basis for the County

Defendants' motion to strike is that on January 26, 2004, an answer was served on the

County Defendants' behalf, along with a First Set of Interrogatories pursuant to Fed. R.

28

Civ. P. 33 ("the interrogatories") and a Notice to Take Deposition of Krause pursuant to Fed. R. Civ. P. 30 ("the deposition notice") (together, "the discovery demands").  Klein Wheaton Affidavit Supporting Motion to Strike ¶ 3 and Exh. A.  On February 23, 2004, Assistant County Attorney Klein Wheaton wrote Krause's attorney, Margaret Murphy requesting Murphy contact Klein Wheaton and Workforce Defendants' attorney, Cheryl Smith Fisher, to confer as to mandatory disclosures and a discovery plan. *Id*. ¶ 4 and Exh. B.  Thereafter, Klein Wheaton, Murphy and Smith Fisher participated in a telephone conference call which resulted in Klein Wheaton's submitting a proposed discovery plan to the court on February 26, 2004.  *Id*.  ¶ 4.  According to Klein Wheaton, at no time during the conference call did Murphy object to the service of the interrogatories prior to the Rule 16(b) conference.  *Id*.

The Rule 16(b) conference was held before the court on March 22, 2004, following which Murphy told Klein Wheaton that Murphy was "working on the interrogatories" and that Krause's answers to the interrogatories would soon be finished.  Klein Wheaton Affidavit Supporting Motion to Strike ¶ 5.  Klein Wheaton responded by advising Murphy that, under the Federal Rules of Civil Procedure, the discovery demands should not have been served until after the Rule 16(b) conference on March 16, 2004 and, as such, Krause's responses to the discovery demands were not due until 30 days after the Rule 16(b) conference.  *Id*.  The court's scheduling order, filed March 23, 2004 (Doc. No. 10), established May 21, 2004 as the deadline for filing mandatory disclosures.  Klein Wheaton received Krause's mandatory disclosures on May 24, 2004.  Klein Wheaton Affidavit Supporting Motion to Strike ¶ 6 and Exh. C.  on August 4, 2004, Klein Wheaton, who had yet to receive any response to the first set of

interrogatories, wrote Murphy requesting responses.  *Id*. ¶ 7 and Exh. D.  Klein

Wheaton never received any response to the letter nor any objections to the discovery

demands she served on January 26, 2004.  *Id*. ¶ 7.   The County Defendants now move

to strike the McDermott Affidavit and Plaintiff's Exhs. F through JJ based on Krause's

failure to disclose such information pursuant to Fed. R. Civ. P. 26(a)'s mandatory

disclosure requirement.

The Workforce Defendants did not separately move to strike but, rather, have

joined in the County Defendants' motion to strike.  Smith Fisher Affidavit ¶ 2.  The

Workforce Defendants specifically challenge evidence Krause submitted in opposition

to summary judgment that was not disclosed pursuant to Fed. R. Civ. P. 26(a)'s

mandatory disclosure requirement, *id.* ¶ 2, and further object to Krause's proffer of

evidence in opposition to summary judgment that was never disclosed in response to

the County Defendants' discovery demands.  *Id*. ¶ 3.  The Workforce Defendants'

attorney, Cherly Smith Fisher, maintains that she advised Krause's attorney, Margaret

Murphy, that the Workforce Defendants were relying on Krause's responses to the

discovery demands, including the interrogatories and document requests, served by the

County Defendants and, thus, Krause's failure to response to the County Defendants'

discovery demands has "unfairly disadvantaged" the Workforce Defendants.  *Id*.

The court first addresses whether the McDermott Affidavit should be struck

based on Krause's failure to disclose, pursuant to Fed. R. Civ. P. 26(a)(1), McDermott

as a witness.  Krause does not deny she failed to disclose Krause as part of her

mandatory disclosure; rather, Krause contends that McDermott was not identified as a

witness until May 21, 2005, and Defendants were given notice on May 27, 2005 that

McDermott was a witness.  Murphy Affirmation Opposing Defendants' Motions to Strike ¶¶ 17-18.  Krause identified McDermott as a potential witness on May 21, 2005, as that is when she learned that McDermott had been laid off from his position with GBW and had not been called back to work.[10]  Krause Affidavit Opposing Defendants' Motions to Strike ¶ 2.  According to Krause, she did not previously identify McDermott as a potential witness because McDermott was a single father who had retained his job with GBW.  *Id*. ¶ 3.  McDermott also states that prior to being laid off by GBW, he never would have agreed to be a witness against his employer given that he was a single father and his concern that giving testimony against his employer could result in adverse consequences at his job.  McDermott Affidavit Opposing Defendants' Motions to Strike ¶ 3.  Krause further states that if Fed. R. Civ. P. 26(a)'s mandatory disclosure requirement mandated the disclosure of all individuals likely to have discoverable information, rather than only those "individuals whom 'the disclosing party may use to support its claims or defenses,'" she would have been required to identify all GBW employees as potential witnesses.  Murphy Affidavit Opposing Defendants' Motions to Strike ¶ 19 (quoting Fed. R. Civ. P. 26(a)(1)).

Although Fed. R. Civ. P. 33(a) ("Rule 33(a)") provides that, absent leave of court or written stipulation, interrogatories may not be served before the parties have conferred as required by Fed. R. Civ. P. 26(f) (requiring parties to confer to establish discovery schedule), and Fed. R. Civ. P. 30 ("Rule 30") forbids serving a deposition

---

[10] McDermott, who was employed as an MIS Assistant with GBW, originally was hired by PIC and, following the discontinuance of PIC as GBW's administrative arm on September 30, 2000, was rehired by WDC for the same MIS Assistant position with GBW.  McDermott Affidavit ¶¶ 2-3.

notice before such conference, Fed. R. Civ. P. 26(a) ("Rule 26(a)") mandates the disclosure of certain evidence without awaiting a discovery request.  Such initial disclosure includes, as relevant to the instant motions, the identity of each individual likely to have information supporting the disclosing party's claims, Rule 26(a)(1)(A), and a copy or description of all documents, data compilations and tangible things within the possession, custody or control of the party who seeks to rely on such information, Rule 26(a)(1)(B).  Rule 26(e)(1) provides that a party is under a duty to supplement earlier disclosures pursuant to Rule 26(a) upon learning that such earlier disclosures were, in some material aspect, incomplete or incorrect and that the additional or corrective information had not otherwise been made known to the other parties.  A party is similarly required to supplement or amend prior responses to interrogatories and discovery requests.  Rule 26(e)(2).

The purpose of mandatory disclosure pursuant to Rule 26 "is to enable the parties to more efficiently formulate discovery requests."  *Mac-Ray Corp. v. Ricotta*, 2004 WL 1368857, *3 (W.D.N.Y. June 16, 2004) (citing *Lorato v. Burlington Northern and Santa Fe Ry. Co.*, 200 F.R.D. 448, 450 (D. Colo.), *rev'd on other grounds*, 201 F.R.D. 509 (D. Col. 2001), and Fed. R. Civ. P. 26, advisory committee's note 1993 Amendment, Paragraph (1)).

Rule 26 does not expressly provide for sanctions for failure to comply, the Advisory Committee note accompanying Rule 26 acknowledges that the trial court may impose such sanctions as excluding the evidence or ordering a continuance.  Fed. R. Civ. P. 26 advisory committee's note.  Fed. R. Civ. P. 37(c)(1) ("Rule 37(c)(1)"), however, provides

> [a] party that without substantial justification fails to disclose information required
> by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required
> by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as
> evidence at a trial, at a hearing, or on a motion any witness or information not so
> disclosed.

Although Rule 37 does not specifically address the failure to supplement in accordance with Rule 26(e), "it is within the inherent power of the district court to impose sanctions for a violation of Rule 26(e) and cases interpreting Rule 37 relating to discovery failures are useful in determining the proper sanctions for such a violation. *Outley v. City of New York*, 837 F.2d 587, 589 (2d Cir. 1988).

The imposition of discovery sanctions is within the discretion of the district court. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976); *Bobal v. Rensselaer Polytechnic Institute*, 916 F.2d 759 (2d Cir. 1990), *cert. denied*, 111 S.Ct. 1404 (1991).  Severe sanctions, such as preclusion of evidence or dismissal of the action, can generally only be imposed upon a showing of willfulness or bad faith on the part of the party refusing discovery.  *Cine Forty-Second Street v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066-67 (2d Cir. 1979).  The court should consider four factors in deciding what sanctions are appropriate.  *Outley, surpa*, at 590.  The four factors include (1) the proponent's explanation for failing to provide the subject evidence; (2) the importance of such evidence to the proponent's case; (3) the opponent's time needed to prepare to meet the evidence; and (4) the possibility of obtaining a continuance to permit the opponent to meet the evidence.  *Outley, supra*, at 590 (citing cases).

In *Outley, supra*, the plaintiff violated Rule 26(e) by failing to supplement the original responses to the defendants discovery requests by providing recently acquired

33

information, *i.e.*, the addresses and telephone numbers of critical eyewitnesses. The defendants first learned the plaintiff had acquired such information at trial when the plaintiff's counsel, in his opening statement, stated that the jury would hear testimony from the eyewitnesses. *Outley, supra*, at 589-90. The defendants moved to preclude the eyewitnesses from testifying and the district court granted the motion. The Second Circuit reversed the preclusion as the record was devoid of any suggestion that the plaintiff's failure to provide the subject information "was anything but the good-faith oversight of an inexperience practitioner." *Id.* at 590.

Here, the case for preclusion of the disputed evidence is even weaker. First, there is no evidence that Krause's failure to supplement her initial responses to Defendants' discovery requests even amounted to the good faith oversight of Krause's counsel given that McDermott was disclosed as a witness less than one week after Krause identified him as such. Murphy Affidavit Opposing Defendants' Motions to Strike ¶ 18. Given the nature of the instant action, *i.e.*, employment discrimination based on political affiliation, McDermott's hesitancy to act as a witness while still employed by GBW, McDermott Affidavit Opposing Defendants' Motions to Strike ¶ 3, is also entitled to some weight.[11] Second, the information contained in the McDermott Affidavit is helpful to Krause's opposition to summary judgment as it provides circumstantial evidence supporting Krause's political affiliation based employment

---

[11] Admittedly, McDermott was subject to subpoena, however, a reluctant witness is not likely to be any more efficacious for a party like Krause than no witness.

discrimination claim.  *See Konits v. Valley Stream Central High School District*, 394 F.3d 121, 124 (2d Cir. 2005) ("In determining whether issues of material fact exist in a discrimination case where the employer's state of mind is at issue, we affirm sparingly a grant of summary judgment because 'careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.'") (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000)).  Third, any prejudice Defendants suffered as a result of Krause's failure to identify earlier McDermott as a potential witness could be overcome by permitting Defendants an opportunity to interview or depose McDermott and Defendants do not deny they had such opportunity while the instant motions were pending.  Finally, Defendants did not investigate the possibility of obtaining a continuance in the form of extending discovery to permit Defendants to depose McDermott prior to filing replies in further support of summary judgment but, instead, seek the more drastic remedy of striking the McDermott Affidavit.  *See Outley*, at 590 ("The rules of discovery were not designed to encourage procedural gamemanship, with lawyers seizing upon mistakes made by their counterparts in order to gain some advantage.  The [defendant] sought the most drastic remedy, preclusion, rather than requesting a remedy or continuance.").  Significantly, the defendants in *Outley* did not learn of the evidence at issue until the opening of the trial whereas in the instant case, no trial date has been set.

On this record, the court finds that Krause's failure to supplement her mandatory disclosures prior to filing the McDermott Affidavit does not warrant its preclusion from

evidence in opposition to summary judgment.  Defendants' motions to strike are

DENIED as to the McDermott Affidavit.

Nor is there any merit to the motions to strike insofar as they seek to strike

Plaintiff's Exhs. F through JJ, which are voter registration cards and records from the

Erie County Board of Elections.[12]  Specifically, the records are public documents which

are equally accessible to all parties.  *See Baum v. Village of Chittenango*, 218 F.R.D.

36, 40 (N.D.N.Y. 2003) (denying motion to compel production of a transcript as

unnecessary where subject transcript was public document and, as such, was "equally

accessible to all.").  Moreover, "[it] is well-established that discovery need not be

required of documents of public record which are equally accessible to all parties."

*Securities and Exchange Commission v. Samuel H. Sloan & Co.*, 369 F.Supp. 994, 995

(S.D.N.Y. 1973).  This observation is consistent with the federal rule governing the

production of documents and things, Fed. R. Civ. P. 34, which permits a party to

request from another party, limited to those documents and things "which are in the

possession, custody, or control of the party upon whom the request is served."  Fed. R.

Civ. P. 34(a)(1).  Defendants reference no legal authority to the contrary.

Accordingly, Defendants' motions to strike are DENIED.

---

[12] Although the County Defendants assert that "it is not clear as to the significance of the cards of many of the individuals or the significance of these individuals to the plaintiff's lawsuit," Klein Wheaton Affidavit Supporting Motion to Strike ¶ 18, a thorough review of the exhibits establishes they are submitted as evidentiary support for Krause's contention that many GBW employees who, after being laid off from PIC on September 30, 2000, were rehired as employees of WDC, either were registered to vote as members of the Republican or Conservative political parties, or changed their political affiliation to such parties within days of being hired by WDC.  The court takes judicial notice that in 1999, Giambra was the Republican and Independence parties' candidate for Erie County Executive against incumbent Dennis Gorski, the Democratic and Conservative parties' candidate.

3.   **Summary Judgment**

The County Defendants move for summary judgment on the merits of the action, arguing that Krause cannot establish a *prima facie* case of employment discrimination based on political affiliation.  County Defendants' Memorandum Supporting Summary Judgment at 2-6.  Alternatively, the County Defendants maintain that they were not personally involved in the decision not to hire Krause for the Director or Program Coordinator position, *id.* at 6-8, that the Program Coordinator position is a policy-making decision that is exempt from constitutional protection, *id.* at 8-10, that the County Defendants are qualifiedly immune from liability on the instant claims, *id.* at 10-11, and that no award of punitive damages can be made against the County Defendants who are sued only in their official capacity.  *Id.* at 11.

The Workforce Defendants also move for summary judgment on the action's merits, arguing that Krause has failed to establish a *prima facie* case of political-affiliation based employment discrimination.  Workforce Defendants' Memorandum Supporting Summary Judgment at 2-5.  The Workforce Defendants alternatively contend that Defendants Finamore and Bratek were not personally involved in the challenged hiring decisions.  *Id.* at 5-7.  As a further alternative, the Workforce Defendants argue the Program Coordinator position is a policy-making decision, and rely on the arguments made by the County Defendants on this issue.  *Id.* at 7.

Krause, in opposition to the summary judgment motions, submits her own affidavit in which Krause more fully explains the basis for her belief that she was not

selected for either of the position for which she applied based on her membership in the

Democratic party, a fact know to Defendants.  Krause also submits several exhibits

which she maintains establishes that Defendants created and maintained a policy of

favoring members of the Republican and Conservative political parties over Democrats

with regard to hiring GBW employees once PIC was phased-out as GBW's

administrative entity and replaced with WDC and WIB.

The County Defendants assert in further support of summary judgment that

much of the evidence on which Krause relies in opposing summary judgment is

hearsay, rather than affidavits, deposition testimony or other proof in admissible form,

and that even the affidavits Krause did submit "are comprised almost entirely of

hearsay."  Klein Wheaton Reply Affidavit ¶¶ 5 and 6.  The County Defendants further

contend that even if the evidence challenged as hearsay is considered, it is insufficient

to establish a *prima facie* case that Krause was not hired for either the GBW's Director

or Program Coordinator position based on her political affiliation, *id.* ¶¶ 7-17; or that the

Krause's Program Coordinator position was a policy-making position that is exempt

from constitutional protection.  *Id*. ¶¶ 18-22.  In further support of summary judgment

the Workforce Defendants direct the court's attention to the motions to the pending

motion to strike and argue that should the motion by denied, the Workforce Defendants

rely on the arguments the County Defendants make in further support of summary

judgment.  Smith Fisher Reply Affidavit ¶¶ 3-5 and 7.  The Workforce Defendants also

submit the Baia Reply Affidavit in which Baia disputes several of Krause's statements

made in opposition to summary judgment, Baia Reply Affidavit ¶¶ 2-8.

As discussed in connection with the conversion of Defendants' motion for judgment on the pleadings to a motion for summary judgment, Discussion, *supra*, at 18-20, summary judgment may be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a) and (b); *Celotex Corp.*, *supra*, 477 U.S. at 322; *Anderson*, *supra*, 477 U.S. at 250-51; *Rattner*, *supra*, 930 F.2d at 209. The court is required to construe the evidence in the light most favorable to the non-moving party, *Tenenbaum*, *supra*, 193 F.3d at 59, the party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact, and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex, supra*, 477 U.S. at 322.  The court is also required to resolve all ambiguities in the record and draw all factual inferences in favor of the party against whom summary judgment is sought.  *Rattner*, *supra*, 930 F.2d at 209.  Further, once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).

A.    *Prima Facie* **Political Affiliation-Based Employment Discrimination**

As stated, Defendants maintain that Krause has failed to establish a *prima facie* case of employment discrimination based on her political party affiliation in violation of the First Amendment right to free association.  County Defendants' Memorandum Supporting Summary Judgment at 2-6; Workforce Defendants Memorandum Supporting Summary Judgment at 2-5.  Krause, in opposition to summary judgment, submits circumstantial evidence which she maintains supports her allegation that as a member of the Democratic party, she was passed over for a GBW position with WDC in favor of members of the Republican and Conservative political parties.  Defendants reply in further support of summary judgment that much of the evidence on which Krause relies in opposition to summary judgment should be disregarded as hearsay, Klein Wheaton Reply Affidavit at 5-6, Smith Fisher Reply Affidavit ¶ 4, and that, in any event, such evidence fails to establish a *prima facie* case of employment discrimination as alleged by Krause.  Klein Wheaton Reply Affidavit ¶¶ 7-22; Smith Fisher Reply Affidavit ¶ 4.

Initially, the court addresses the County Defendants' assertion that much of the evidence Krause submits in opposition to summary judgment must be excluded as inadmissible hearsay.  Klein Wheaton Reply Affidavit ¶¶ 5 and 6.  In particular, Krause submits the affidavit of one Brian McDermott, as noted, a former co-worker at GBW, who corroborates many of Krause's statements, and a volume of exhibits containing, *inter alia*, a copy of the job description posted in connection with the vacancy for the

GBW Progam Coordinator position for which Krause was hired by PIC, Plaintiff's Exh.

A, a copy of a newspaper article printed in THE BUFFALO NEWS, the local newspaper of

general circulation, regarding the phase-out of PIC and resulting lay-offs of PIC

employees, Plaintiff's Exh. B, a copy of the July 25, 2000 Bratek Letter, advising that

PIC would all PIC employees would be permanently laid-off on September 30, 2000

when PIC would cease to provide services, and encouraging PIC employees to apply

for positions within the replacement workforce development systems, such as WDC,

Plaintiff's Exh. C, a copy of Krause's resumé she submitted in applying for the GBW

Director and Program Coordinator positions, Plaintiff's Exh. D, a copy of another

newspaper article printed in THE BUFFALO NEWS regarding Giambra's hiring of Marconi

for the GBW Program Coordinator position, Plaintiff's Exh. E, copies of voter

registration cards and records, filed at the Erie County Board of Elections, for various

GBW employees, Plaintiff's Exhs. F through JJ, and copies of the job descriptions

posted in connection with the announced vacancies for the GBW Director and Program

Coordinator positions with WDC for which Krause applied, but was not hired.  Plaintiff's

Exh.  KK.

     As to the County Defendants' assertion that portions of the Krause and

McDermott Affidavits are hearsay and, as such, should be disregarded by the court in

considering the summary judgment motions, Klein Wheaton Reply Declaration ¶ 6, the

County Defendants have failed to specify either the portions of the Krause and

McDermott Affidavits which they maintain are hearsay, or the basis for their hearsay

argument.  It is improper for the court to search the affidavits to determine what portions

the County Defendants, who are represented by counsel, claim are hearsay, or to

attempt to determine the basis for such an objection as to do so would indicate the

court has abandoned its neutral role in favor of advocating on behalf of the Workforce

Defendants.  *See Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d

Cir. 2002) ("Fed. R. Civ. P. 56 does not impose an obligation on a district court to

perform an independent review of the record to find proof of a factual dispute."); *Little v.

Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) ("[J]ust as a district court is not

required to scour the record looking for factual disputes, it is not required to scour the

party's various submissions to piece together appropriate arguments.").

Moreover, many of the statements made by Krause and McDermott in their

respective affidavits in which they recount statements allegedly made to them by other

persons would qualify for the "state of mind" exception to the hearsay rule.  *See* Fed. R.

Evid. 803(3) (excepting from exclusion as hearsay statements pertaining to "the

declarant's then existing state of mind, emotion, sensation or physical condition").  For

example, Krause's assertion, Krause Affidavit Opposing Summary Judgment ¶¶ 26-27,

that on June 22, 2000 Bratek told Krause "he was hoping to 'play ball with the new

administration,'" that cooperating with the new administration might help "to save a few

people from losing their jobs," that Bratek was not concerned about the security of his

own job because he was a registered Republican and "someone who was close to

Giambra had sent a letter on [Bratek's] behalf to Giambra," and that "the 'only thing' that

could jeopardize [Krause's] job was [her] friendship with James P. Keane, the former Deputy County Executive," is admissible to show that such statements caused Krause to believe that Democrats employed by PIC in GBW positions might be politically targeted for replacement based on their political affiliations.  Similarly, Krause's assertion, Krause Affidavit Opposing Summary Judgment ¶ 39, that she was informed by Kaczmarek that Kaczmarek had advised "Finamore that GBW should be kept intact," and that Kaczmarek's "exact words were, 'you don't fix something that is not broken,'" is admissible to show that such statement caused Krause to believe she would be rehired by WDC for the GBW Program Coordinator position after the transition from PIC.  As such, insofar as Krause and McDermott rely on statements made by others to establish their respective states of mind upon hearing the statements attributed to others, such third-party statements do not constitute hearsay.  Significantly, Defendants challenge neither the relevancy or accuracy of any of the statements contained in the affidavits made by Krause and McDermott in opposition to summary judgment.

The County Defendants also urge the court to disregard as hearsay the two articles printed in THE BUFFALO NEWS.  Klein Wheaton Reply Affidavit ¶ 5.  Again, no reason for excluding the articles as hearsay is provided.  The court, however, may consider such statements as newspaper articles so long as they are not submitted for the truth of the matter asserted therein.  *See Shafii v. PLC British Airways*, 22 F.3d 59, 64-65 (2d Cir. 1994) (holding that as affidavit submitted in opposition to summary judgment containing affiant's recollection of statements made by arbitrator was offered

not for the truth of the matter asserted but to establish fact that such statements had

been made, the affidavit did not constitute inadmissible hearsay and could be

considered by court); *Hoppe v. G.D. Searle & Co.*, 779 F.Supp. 1413, 1425 (S.D.N.Y.

1991) (admitting anecdotal information of patient's experience with intrauterine device

to establish whether manufacturer had notice of alleged product defect); and *Brock v.*

*Jackie Fine Arts, Inc.*, 1986 LEXIS, 16265, *1-2 (D.Kan. 1986) (holding that "the

[newspaper] article was offered to show plaintiff's becoming aware of facts which led

him to discover the fraud upon which his causes of action were based.  This was

relevant to when the statute of limitation began to run.  Therefore, the article was not

offered for the truth of the matter, and defendants' objection on this basis is meritless.").

Furthermore, as to the newspaper article pertaining to Marconi being hired as the GBW

Program Director, Plaintiff's Exh. E, given that the article refers to Giambra's "long

friendship" with Marconi, as well as that others recently hired for jobs with the WDC

included Giambra's sister-in-law Regina Lettieri, Giambra's cousin, Frank Panaro, and

several close friends of Giambra, the article would also qualify for the state of mind

exception from the hearsay exclusionary rule, *i.e.*, Fed. R. Evid. 803(3).

There is also no merit to the County Defendants' assertion, Klein Wheaton Reply

Affidavit ¶ 5, that Plaintiff's Exhs. F through JJ, the records from the Erie County Board

of Elections, are hearsay.  Not only do the County Defendants fail to specify a basis for

such argument, but given that the subject exhibits are public records, they are not

excluded by the hearsay rule itself.  Fed. R. Evid. 803(8) (providing, as relevant, that

records of public offices or agencies, setting forth "matters observed pursuant to duty imposed by law as to which matters there was a duty to report," are exceptions to the hearsay exclusionary rule).

As such, the court need not disregard as hearsay any evidence Krause submitted in opposition to summary judgment. The court thus turns its attention to whether the record establishes a *prima facie* case of employment discrimination based on political party affiliation in violation of Krause's First Amendment right to free association.

The Second Circuit has instructed that "[t]o prevail on a First Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff must prove by a preponderance of the evidence that (1) the expression at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally protected expression, and (3) a causal relationship existed between the constitutionally protected expression and the retaliatory action." *Camacho*, *supra*, 317 F.3d at 160 (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled in part on other grounds by Phelps v. Kapnolas*, 308 F.3d 180, 187 n. 6 (2d cir. 2002). "Affiliating oneself with a political party or faction is [ ] protected by the First Amendment." *Camacho*, *supra*, 317 F.3d at 160. As such, "the failure to promote, transfer, or recall a low-level public employee after layoffs based on his or her political affiliation is an impermissible infringement on First Amendment rights." *Notaro*, *supra*, 2005 WL 711875 at *7 (citing *Rutan*, *supra*, 497 U.S. at 76 (conditioning hiring for public employment position on political belief and association

violates applicant's First Amendment right in absence of vital governmental interest)).

In the instant case, Defendants do not argue that Krause has not met the first two prongs of establishing a *prima facie* case of employment discrimination in violation of the First Amendment, including that Krause's membership in a particular political party is constitutionally protected, and that Defendants' failure to rehire Krause for a GBW position with WDC adversely affected Krause. Nevertheless, Defendants maintain that Krause has failed to establish the third prong, specifically, a causal relationship between her membership in the Democratic party and Defendants' failure to rehire Krause.

The Second Circuit has repeatedly held that circumstantial evidence is sufficient to establish a *prima facie* case of employment discrimination so as to avoid summary judgment, particularly when the employer's state of mind, in this case, Defendants' political animus toward Democrats on the WDC payroll, with respect to the alleged discrimination is at issue. *See Konits*, *supra*, 394 F.3d at 124 ("In determining whether issues of material fact exist in a discrimination case where the employer's state of mind is at issue, we affirm sparingly a grant of summary judgment because 'careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.'") (quoting *Graham*, *supra*, 230 F.3d at 38 (2d Cir. 2000)); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("we affirm a grant of summary judgment in favor of an employer sparingly because 'careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required

46

inference of discrimination.").  In the instant case, Krause submits ample evidence in opposition to summary judgment establishing, circumstantially, that Defendants created and maintained a policy of passing over Democrats, including Krause, in favor of Republicans and Conservatives (and some of Giambra's friends and relatives), for GBW positions within WDC.

Specifically, Krause's evidence includes her recollection of the circumstances under which she was hired by PIC for the GBW Program Coordinator position, Krause Affidavit Opposing Summary Judgment ¶¶ 2, 13, none of which Defendants dispute. According to Krause, she possessed the education and experience in the field of job training required for the position.  Krause Affidavit Opposing Summary Judgment ¶ 2. Krause also maintains that when she was initially offered the Program Coordinator position, she was advised by both Bratek and Kaczmarek that she "had a job commitment for the three-year duration of the grant."  *Id*. ¶ 13.  Krause further states that Bratek and Kaczmarek advised her that PIC had applied for "another round of funding," that if the additional funding request was approved, the position would be extended for an another three years, and that Krause was later informed PIC's additional funding request had been approved. *Id*.

Krause also states that upon learning that PIC was to be "phased-out" and replaced by the WDC and WIB in 2000, she was also advised that the welfare-to-work funding would be unaffected and that Kaczmarek initially told Krause that "the transition from PIC to WDC would have no impact on Greater Buffalo Works.  In fact,

[Kaczmarek's] exact words [to Krause] were 'they [the Giambra administration] cannot touch this program.'" Krause Affidavit Opposing Summary Judgment ¶¶ 16-18. According to Krause, prior to Giambra's election as Erie County Executive in 2000, "Bratek had adhered to a policy that all candidates must meet the minimum qualifications described in the respective job descriptions," otherwise, PIC would have "trouble with the State." *Id*. ¶ 20.  On March 29, 2000, Bratek called Krause to ask whether she knew if any of the formula grant staff had been recommended for their employment positions by Buffalo Mayor Anthony Masiello. *Id*. ¶ 21.  Although Krause found the inquiry "odd," she nevertheless informed Bratek she was unaware of any such recommendations. *Id*.  In June 2000, Bratek raised the topic again with Krause, to which Krause responded by questioning whether such inquiry was appropriate, and Bratek replied that Finamore had directed Bratek to ask the question and that when Bratek protested that the inquiry was inappropriate, Finamore stated he did not care, and directed Bratek to ask the question anyway. *Id*. ¶ 22.  Significantly, Bratek further told Krause he had a witness to the conversation in case he was called as a witness in a lawsuit, implying Bratek was aware that politically motivated hiring was potentially actionable. *Id*.

On June 22, 2000, Bratek provided Krause with the resumés of applicants applying for vacant positions, advising Krause that the resumés had come directly from County Executive Giambra's Office.  Krause Affidavit Opposing Summary Judgment ¶ 23.  The four individuals included Giambra's sister-in-law Regina Lettieri ("Lettieri"), who

was applying for a Case Manager position although she did not possess a college degree in a relevant field, nor the requisite work experience. *Id*. ¶ 24. Gary Quatrani ("Quatrani") and Tony Petronella ("Petronella") were applying for Outreach and Recruitment Specialists positions, although Quatrani did not possess the college degree required by the job description, and Petronella did not possess a driver's license, nor did he own a car, both job requirements. *Id*. ¶ 25. Krause maintains that during her interview with Petronella, Petronella advised her that he knew Giambra. *Id*.

Krause maintains she expressed her concern to Bratek that the four applicants did not possess the minimum qualifications for the positions for which they had applied. Krause Affidavit Opposing Summary Judgment ¶ 23. According to Krause, Bratek told her during their June 22, 2000 meeting that he was hoping to "play ball with the new administration," and that by cooperating with the new administration, they might be able to save some people from losing their jobs. *Id*. ¶ 26. Bratek further stated that he was not too concerned about his own position given that Bratek was a Republican and someone who was close to Giambra had written Giambra a letter on Bratek's behalf. *Id*. When Krause expressed concern about her own position, Bratek allegedly responded that "the 'only thing' that could jeopardize [Krause's] job was [her] friendship with James P. Keane, the former Deputy County Executive." *Id*. ¶ 27. The June 22, 2000 conversation concluded with Bratek directing Krause to put the four applicants to work "'as soon as possible.'" *Id*. ¶ 28.

Also hired at the same time as the above four individuals, were Frank Panaro, as

Employment Specialist for the competitive grant, who was supervised by Rifenburg. Krause Affidavit Opposing Summary Judgment ¶ 29.  Shortly thereafter, Lettieri, Panaro and Petronella began "signing out" together to go the Rath Building to see Calabrese, whom Defendants describe as the "'point person for work force development and the phase-out of'" PIC (quoting Affidavit of Carl Calabrese ("Calabrese Affidavit"), County Defendants' Exh. B ¶ 2), despite the fact that Krause never assigned any matter to Lettieri or Petronella requiring them to consult with Calabrese.  *Id*. ¶ 30.  Krause also maintains that Quatrani was told at the County Executive's office that after September 30, 2000, he would be carried over and he would receive a pay raise.  *Id*. ¶ 31.

Krause asserts that Taczkowski informed people within GBW's office that after the transition and phase-out of PIC, he would be given the Senior Employment Specialist position, then held by Albert "Day" Wilhelm ("Wilhelm").  Krause Affidavit Opposing Summary Judgment ¶ 32.  However, a GBW client accused Taczkowski of sexual harassment and Lettieri brought the charges to the attention of the County Executive. *Id*. Shortly before September 30, 2000, Krause received a telephone call from a Giambra aide inquiring as to whether the accusations had been brought by a client.  *Id*. Krause advised that she could not comment and that all personnel matters and complaints were forwarded to and handled by Bratek.  *Id*.

Krause maintains that Therese Sardo ("Sardo"), a formula case worker whom Krause supervised, reported to Krause on July 24, 2000, that Taczkowski had visited Sardo in her office and questioned Sardo as to how she got her job, as well as wether

50

Sardo was her married or maiden name.  Krause Affidavit Opposing Summary

Judgment ¶ 33.  According to Krause, Sardo stated she felt intimidated and fearful that

"she might be losing her job." *Id*.  Krause also states she was informed by Kevin

Hannon (Hannon"), an Employment Specialist, that Taczkowski had told him that the

Giambra administration had the names of those who had made telephone calls on

behalf of the Gorski campaign, and that those people would not be retained.  *Id*. ¶ 34.

Krause shared these conversations with Bratek who assured her he would speak with

someone.  *Id*. ¶ 35.  On July 25, 2000, Krause received the July 25, 2000 Bratek Letter

advising that all PIC employees would be permanently laid-off on September 30, 2000,

and encouraging the PIC employees to apply for employment with the new workforce

development entities.  *Id*. ¶ 36.

In August 2000, the job specifications were posted for the GBW Director and

Program Coordinator positions and Krause submitted her resumé for both positions,

confident she would receive an interview for the Program Coordinator position she then

occupied as a PIC employee.  Krause Affidavit Opposing Summary Judgment ¶¶ 37-39.

According to Krause, GBW was a successful program that had exceeded all the goals

set forth in the formula grant applications, and Kaczmarek had informed Krause that

she had told Finamore that after the transition, GBW should be kept intact because

"you don't fix something that is not broken."  *Id*. ¶ 39.  Krause had received only

favorable reviews as Program Coordinator and Bratek had told her he saw no reason

she would not be rehired except, possibly, for her friendship with former Deputy County

Executive James Keane, a prominent Democrat.  *Id*. ¶ 40.

According to Krause, during July and August 2000, there was much gossip and speculation among her co-workers that she would be politically targeted for removal, and that much of the gossip was fueled by co-workers with close political connections to the Giambra administration.  Krause Affidavit Opposing Summary Judgment ¶ 41. Krause further maintains that on July 27, 2000, Ed Patton, a Senior Employment Specialist on the competitive grant GBW administered informed Krause that he heard from his political sources that Krause was in trouble, was targeted for removal, and that while attending a family member's wake, had been told that "the Giambra people wanted [Krause] out." *Id*. ¶ 42.  On August 29, 2000, Fred McNeela, a Case Manager on the competitive grant told Krause he had heard Krause was in trouble and targeted to lose her job, that he was sorry and wished her the best.  *Id*. ¶ 43.

Krause asserts that on September 26, 2000 she had a telephone conversation with PIC Assistant Executive Director Vivian Turner ("Turner") who stated that "unfortunately, we are working in a political environment," and asked for "off the record" information as to whether there was anything political she should know about Day Wilhelm.  Krause Affidavit Opposing Summary Judgment ¶ 49.  Krause responded that she did not think so, but that Rifenburg, who was in Krause's office and overheard the telephone conversation, told Krause to tell Turner that Wilhelm was not "political," but that he was a registered Republican.  *Id*.  The next week, Krause received a telephone call at home from Wilhelm who said that Baia had checked Wilhelm's political affiliation

and, after confirming Wilhelm was a Republican, told Wilhelm he was rehired.  *Id*. ¶ 50.

Krause also challenges Defendants' assertion, County Defendants' Fact Statement ¶¶ 10-11; Workforce Defendants' Fact Statement at 4, that interviews for employment positions with WDC were offered only to the top candidates to accelerate the hiring process.  Krause Affidavit Opposing Summary Judgment ¶ 52.  In particular, Krause points to the fact that Marconi, who was hired for the Program Coordinator position and whose background was in housing, did not possess the requisite management or supervisory experience in job training or placement.  *Id*. ¶¶ 53, 56. Krause further points to the fact that Rifenburg was hired for the other Program Coordinator position despite her lack of any college degree. *Id*. ¶  54.

Many of Krause's evidentiary assertions are corroborated by McDermott.  In particular, McDermott avers that after Giambra became Erie County Executive in 2000, all new personnel hired to fill vacancies within GBW were connected to the Giambra administration.  McDermott Affidavit ¶ 4.  McDermott recalled that shortly after Lettieri was hired as a Case Manager, she was made a supervisor and promoted to Senior Case Manager, advised everyone in the office that Giambra was her brother-in-law, and "never hesitated to pick up the phone to call her brother-in-law anytime she wanted to complain about something."  *Id*. ¶ 5.  Giambra's cousin, Panaro, who was originally hired as an Employment Specialist, was promoted to the position of Senior Business Service Specialist, without the position ever being posted.  *Id*. ¶ 6.  McDermott corroborates Krause's assertions that Quatrani, Petronella and Taczkowski were hired

based on their connections to the Giambra administration, and that after Giambra assumed office, various GBW employees signed out to the County Executive's Office, a practice that previously did not occur.  McDermott Affidavit ¶ 8.

McDermott also states that upon applying for rehire in his MIS Assistant position with GBW after PIC's phase-out, Bagen advised him that no "real" interviews would be conducted, and, when McDermott arrived at his interview, he was not asked any questions but, rather, he was "simply told to report to work on Monday, October 2, 2000."  McDermott Affidavit ¶ 10.  Bagen informed McDermott that he was "on the list" of people to be retained, but that others, including Reggie Garner ("Garner"), Sue Gallagher ("Gallagher"), Hannon and Rick Miazga ("Miazga"), were "off the list."  *Id*. ¶ 11.  Tameki J. Hollie ("Hollie") and Angel Rodriguez ("Rodriguez:"), both formula Case Managers, were told they were not on the list. *Id*. ¶ 12.  When Hollie began crying in her office, Lettieri told Hollie Lettieri would contact her brother-in-law, *i.e.*, Giambra, to find out why Hollie was not given an interview, and later told Hollie she would be transferred to another agency within the new organization.  *Id*.

Upon reporting to work at GBW on October 2, 2000, McDermott learned that Krause had been replaced by Marconi, Garner had been replaced by Lettieri, Hollie and Rodriguez were re-assigned after training their replacements, James D. Kucewicz and Felipe Nieves, and the Employment Specialists, funded by the formula grant and previously filled by Gallagher, Hannon and Miazga, as well as two vacant positions, were filled by Phil DiCarlo, Andrea Grieser, Patty Hoover, Jim Michalak and Larry Long,

all members of the Republican party.  *Id*. ¶¶ 13-17.

McDermott states that when he was initially hired by PIC, Krause, who was his supervisor, always was professional, treating everyone equally and fairly.  McDermott Affidavit ¶ 28.  McDermott considered it "unfortunate" that Krause was not retained as a Program Coordinator because Krause "inspired and supervised a team of hardworking people whom she challenged to give the best that they had to offer."  *Id*.  After the transition from PIC to WDC, McDermott worked with Marconi.  *Id*. ¶ 29.  McDermott maintains that he worked well with Marconi, although Marconi "did have a short fuse and he often lost his temper with people."  *Id*.  McDermott is of the opinion that Krause "was a more effective supervisor [than Marconi] and was better able to get the best out of people," *id*. ¶ 30, and McDermott believes "the only reason Maureen Krause was not rehired is because the WDC wanted to make room to hire other people connected and recommended by the Giambra administration.  It was no coincidence that Democrats in higher paying positions were removed from their jobs."  *Id*. ¶ 31.

After the transition from PIC to WDC, McDermott maintains that except for the appointment of a Director to head GBW, GBW's operations did not change and all other positions remained the same, functioning under the same duties and responsibilities they had under PIC.  McDermott Affidavit ¶ 22.  GBW's work environment, however, had changed dramatically, with GBW becoming far more political.  *Id*. ¶¶ 23-24.  According to McDermott, he "soon realized that if you wanted to keep your job or get promoted, you had to play the political game." *Id*. ¶ 25.

Accordingly, McDermott, who is a registered Democrat, purchased from Baia a Republican party fundraiser ticket and, when asked, agreed to work at Republican headquarters, as well as at the campaign headquarters for various Republican candidates. *Id*. ¶¶ 25-26, 32. Upon reporting for work in such headquarters, McDermott was required to sign-in or provide a "specially assigned four digit identification code." *Id*. ¶ 26.

McDermott asserts three reasons he was permitted to retain his job at GBW after the transition including that his position was in a lower pay scale whereas WDC employees connected to the Giambra administration held higher paying positions. McDermott Affidavit ¶ 32. Second, McDermott maintains he was the only employee who understood the MIS computer system and who could electronically produce the status reports needed for the State of New York. *Id*. Third, McDermott did what was expected to save his job, even going to far as to support the Republican party and Giambra, because McDermott, as a single father, could not afford to lose his job. *Id*.

According to the copies of the Erie County Board of Elections voter registrations Krause submits in opposition to summary judgment, most of the people hired for positions with WDC were Republicans or Conservatives, who replaced PIC employees who were Democrats. Specifically, Republicans hired include Philip L. DiCarlo, Sr., James Finamore, C. Andrea Grieser, Patricia A. Hover, James D. Kucewicz, Regina Lettieri, Larry J. Long, Anthony Marconi, James J. Michalek, Gary K. Quatrani, Edith J. Rifenburg, and Albert D. Wilhelm, II. Respectively, Plaintiff's Exhs. J, K, N, R, V, W, X,

Y, BB, FF, GG, and JJ.   Conservative party members hired include Paula M. Hughes

and Anthony Petronella.   Plaintiff's Exhs. S and DD, respectively.   Former PIC

employees, who are registered Democrats and who did not retain their positions with

GBW following the transition to WDC include Suzanne M. Gallagher, Reginald S.

Garner, Kevin B. Hannon, Ralph R. Hernandez, Tameki J. Hollie, Krause, Richard L.

Miazga, Jr., Felipe Nieves, Jr., and Suzanne M. Pfleger.   Respectively, Plaintiff's Exhs.

M, O, P, U, AA, and EE.   Registered Democrats Suzanne M. Gallagher, Tameki J.

Hollie, and Felipe Nieves, Jr., respectively, Plaintiff's Exhs. L, Q and CC, were rehired

by WDC, but were transferred to other positions, and the record does not indicate

whether their new positions were essentially similar to their former positions, or qualified

as promotions or demotions.   Voter registration records show that Krause's former

supervisor, Kaczmarek, who retained her GBW position after the transition, is a

member of the Independence party, Plaintiff's Exh. T, Therese A. Sardo, for whom it is

not clear from the record whether she retained her GBW position following the

transition, is a Democrat, Plaintiff's Exh. HH, and Richard L. Taczkowski is not affiliated

with any political party, Plaintiff's Exh. II.   Finally, although McDermott, a Democrat,

Plaintiff's Exh. Z, retained his MIS Assistant position with GBW immediately following

the transition from PIC to WDC, he was among those laid-off in February 2005 in

connection with Erie County's on-going fiscal crisis.   Baia Reply Affidavit ¶ 8.

Although Defendants moved to strike the above evidence Krause submitted in

opposition to summary judgment for failure to comply with discovery, or as inadmissible

hearsay, Defendants have not challenged any of the evidence, other than to clarify that two Democrats who were not rehired for the GBW positions they held prior to the transition from PIC to WDC, Sue Gallagher and Tameki Hollie, were given positions in other WDC programs. Baia Reply Affidavit ¶ 5. Nowhere in the record, however, is there any indication that the new positions in which Gallagher and Hollie were placed were similar, or at the same pay level as their previous GBW positions.

As to the Workforce Defendants' assertion that Baia provides "direct evidence" for the reasons Krause was not hired as a Program Coordinator, Smith Fisher Reply Affidavit ¶ 6, a plain and thorough reading of the Baia Reply Affidavit reveals no such evidence. Rather, Baia merely challenges Krause's assertion that no changes were made to the GBW program following the transition as a PIC program to a WDC program, given that Baia's position as GBW Director did not exist when GBW was a PIC program. Baia Reply Affidavit ¶ 4. Accordingly, Baia's confirmation of the similarity in the two programs lends support to Krause's contention that she was well qualified for the new Program Coordinator position with WDC. As for Baia's statement that "[t]he vast majority" of GBW employees under PIC were hired by the WDC, and that only five employees were not hired by the WDC, Baia Reply Affidavit ¶¶ 3, 6, Baia admits that not all GBW employees under PIC who were rehired as WDC employees were placed in positions within the GBW program, nor does Baia indicate whether those who were rehired by WDC and placed in programs other than GBW were given positions similar to those held as PIC employees, or whether they were, essentially, demoted to lower

paying jobs with lesser education and work experience requirements so as to create vacancies in more desirable positions to be filled by Republican new hires.  Baia also challenges as incorrect McDermott's assertion that Baia sold McDermott a ticket to a Republican fundraiser.  Baia Reply Affidavit ¶ 7.

Krause's circumstantial evidence thus suggests a "causal relationship" between her membership in the Democratic party and Defendants' decision not to rehire Krause for a GBW position with WDC, as required for the third prong of a prima facie case of employment discrimination based on political affiliation.  *Camacho*, *supra*, 317 F.3d at 160.  In particular, Krause objectively possessed the requisite education and work experience, and had been working as a GBW Program Coordinator since December 1998, yet was not even selected to interview for such position.  Rather, Marconi, who objectively did not possess the requisite work experience, but is a good friend of Giambra, was hired for one of the Program Coordinator positions, and Rifenburg, who objectively did not possess the requisite education, but is a registered Republican, was hired for the other Program Coordinator position.  Further, the Erie County Board of Elections records corroborate's Krause's contentions, which Defendants do not challenge, that many of the PIC employees who were not rehired were Democrats, and were replaced as WDC employees with new hires who belonged to either the Republican or Conservative parties.

Simply put, Defendants have failed to sufficiently challenge the evidence Krause submits such that a reasonable trier of fact could find, on the record before the court,

that circumstantial evidence establishes Defendants created and maintained a policy of hiring persons based on their political affiliations, including the Republican and Conservative Parties and those associated with the Giambra administration, and excluding Krause because of her Democratic affiliation.  As such, on this record, a reasonable jury could find that, but for Krause's 'disqualifying' political affiliation, and friendships, Krause would in fact have been rehired by WDC as a GBW Program Coordinator.  Accordingly, summary judgment should be DENIED.

### B.    Personal Involvement

The County Defendants alternatively move for partial summary judgment as to Defendants Giambra and Calabrese, on the basis that no evidence establishes that either Giambra or Calabrese was "personally involved" in the alleged constitutional deprivation, *i.e.*, the hiring of GBW employees after the transition from PIC to WDC. County Defendants' Memorandum Supporting Summary Judgment at 6-8.  Similarly, the Workforce Defendants alternatively move for partial summary judgment with regard to Defendants Finamore and Bratek on the basis that neither Finamore nor Bratek was personally involved in the hiring of GBW counselors.  Workforce Defendants' Memorandum Supporting Summary Judgment at 6-7.  Krause has not directly responded to these arguments.

 It is well established that the doctrine of *respondeat superior* does not establish liability in a §1983 action.  *Monell v. New York City Department of Social Services*, 436

U.S. 658, 691-95 (1978).  Rather, the prerequisite for liability under a §1983 claim is personal involvement by a defendant in the alleged constitutional deprivation. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997);  *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).  The mere fact that a defendant holds a supervisory position over others accused of violating a plaintiff's constitutional rights is insufficient to impose §1983 liability absent proof of personal involvement.  *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977).  Instead, in a civil rights action brought against a defendant in a supervisory capacity, personal involvement in an alleged constitutional deprivation must be shown by allegations or evidence that the defendant (1) directly participated in the alleged constitutional violation, (2) failed to remedy the wrong upon being informed of the violation, (3) created a policy or custom which permitted the alleged constitutional violation to occur, (4) was grossly negligent in supervising subordinates who committed the allegedly wrongful acts, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the unconstitutional acts were occurring.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing cases).  Moreover, the complaint must set forth facts which would support a claim that the defendant either knew or should have known of the events of which the plaintiff complains.  *Colon*, *supra*, at 873-74.

In the instant action, Defendants proceed as though Defendants Giambra, Calabrese, Finamore and Bratek can only be found liable under § 1983 for employment discrimination based on political affiliation if Giambra, Calabrese, Finamore and Bratek

were directly involved in the particular hiring process by which the decision not to hire

Krause for a GBW position with WDC was made.  Although direct involvement in an

alleged constitutional deprivation is the first of five conditions identified by the Second

Circuit as supporting supervisory liability under § 1983, a plain reading of the Complaint

shows that Krause claims that Giambra, Calabrese, Finamore and Bratek created and

maintained a policy that permitted the alleged constitutional deprivation, the third

condition supporting § 1983 supervisory liability.  *Colon*, *supra*, at 873.  Furthermore,

the Complaint and the affidavits and exhibits Krause submits in opposition to summary

judgment set forth facts supporting that Defendants Giambra, Calabrese, Finamore and

Bratek either knew or should have known of the policy of which Krause complains.

*Colon*, *supra*, at 873-74.

Here, as the record demonstrates that the PIC, GBW and WDC are major

federally funded programs providing numerous non-competitive civil service jobs

subject to discretionary appointment, it is plausible that a reasonable jury could find that

the hiring process of such positions would not likely escape the interest and attention of

Giambra and Calabrese, not to mention the other individual Defendants, including

Bagen, Baia, Bratek and Finamore, who, as current or former senior executives of the

WDC programs, were directly involved in their administration.  This appraisal is well

supported by Krause's evidence that Lettieri frequently called Giambra to complain

about various matters of the GBW and to learn why Hollie had not been rehired.

Further, Petronella, who was hired by WDC for an Outreach and Recruitment Specialist

position, despite the fact that he neither possessed a valid driver's license, nor owned

an automobile, as required per the posted job description, told Krause during his

interview with Krause that he "knew Giambra."  Krause Affidavit Opposing Summary

Judgment ¶ 25.  That Petronella was hired despite his undisputed lack of an objective

qualification adds credence to Petronella's asserted good relationship with Giambra.

Petronella was also one of the WDC employees whom McDermott observed on several

occasions had "signed out" to County Executive Giambra's office.  McDermott Affidavit

¶ 8.[13]

    As such, insofar as Defendants maintain seek partial summary judgment on

behalf of Giambra, Calabrese, Finamore and Bratek on the basis that no evidence

shows these Defendants were personally involved in the hiring of staff to fill GBW

positions after the transition from PIC to WDC, the motions should be DENIED.


### C.    Policy-Making Position

    The County Defendants alternatively argue in support of summary judgment that

Krause's Program Coordinator position with GBW was a policy-making position and, as

such, was exempt from constitutional protections.  County Defendants' Memorandum

Supporting Summary Judgment at 8-10.  The Workforce Defendants join in the County

---

[13] Although Krause does not allege or explain that Giambra, as County Executive, and Calabrese, as Deputy County Executive, were vested with any authority or imbued with any influence, whether through any regulation, statute or custom and practice, regarding hiring and firing decisions pertaining to the WDC, Defendants also fail to contend, to the contrary, that Giambra had no such authority or influence.

Defendants' argument on this point, but do not separately address the issue.
Workforce Defendants' Memorandum Supporting Summary Judgment at 7.

"Political affiliations of low-level political players are constitutionally protected
from government retaliation, whereas political affiliations of 'policymakers' are not
similarly protected." *Camacho*, *supra*, 317 F.3d at 160-61.  The cases of *Elrod v.
Burns*, 427 U.S. 347 (1976) and *Branti v. Finkel*, 445 U.S. 507 (1980) "established the
principle that policymaking staffers may permissible be fired by elected officials based
on the staffers' political views and associations."  *Velez v. Levy*, 401 F.3d 75, 95 (2d
Cir. 2005).  In particular, the "policymaker" exception to the "First Amendment retaliation
doctrine derives from a political imperative: the people's chosen representatives must
be allowed to select aides who share their political views, and hence to fire - - on
political grounds - - the aides of a previous incumbent."  *Velez*, *supra*, at 95 (citing
*Elrod*, *supra*, 427 U.S. at 367, and *Branti*, *supra*, 445 U.S. at 518).  "Put another way,
we recognize this exception to ensure that 'representative government [is] not . . .
undercut by tactics obstructing the implementation of policies of the new administration,
policies presumably sanctioned by the electorate.'"  *Velez*, *supra*, at 95 (quoting *Elrod*,
*supra*, 427 U.S. at 367).

A "policymaker" has been defined as "someone for whom 'political affiliation is an
appropriate requirement when there is a rational connection between shared ideology
and job performance,'" *Camacho*, *supra*, at 161 n. 6 (quoting *Savage v. Gorski*, 850
F.2d 64, 68 (2d Cir. 1988)), as well as "a person occupying a position calling for political

loyalty." *Camacho*, *supra* (citing *Regan v. Boogertman*, 948 F.2d 577, 580 (2d Cir. 1980)).  In determining whether an employee is a "policymaker," as contemplated by the *Elrod* and *Branti* courts, a court may consider whether the employee (1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders." *Butler v. New York State Dep't of Law*, 211 F.3d 739, 744 (2d Cir. 2000) (citing *Vessetti v. Pellegrini*, 22 F.3d 483, 486 (2d Cir. 1994)).  Further, although no one factor is dispositive of the issue of whether a person occupies a "policymaking" position, this nonexhaustive list may be used by the court as a guide in making its assessment. *Butler*, *supra*, 211 F.3d at 744 (citing *Vona v. County of Niagara*, 119 F.3d 201, 209 (2d Cir. 1997)).

Furthermore, courts recognize that the assertion that an employment position is a policy-making position and, thus, exempt from constitutional protections is an affirmative defense.  *See Conjour v. Whitehall Township*, 850 F.Supp. 309, 318 (E.D.PA. 1994) (observing that defendant raised as an affirmative defense in support of summary judgment that discharged plaintiff, who brought First Amendment claim challenging his termination, had held a policy-making position "for which political affiliation was an appropriate consideration for employment decisions"); *Rice v. Ohio Dept. of Transp.*, 1991 WL 494243, * 2 (S.D.Ohio July, 10, 1991) (considering defense

that plaintiff's former employment position was policy-making position in which the plaintiff did not enjoy constitutional protection was an affirmative defense, although such defense did not need to be pleaded in the answer to avoid waiving it); and *Muller v. McGraw-Hill, Inc.*, 1986 WL 1170, * 1 (Jan. 23, 1986) (observing that defendant "raised the affirmative defense" that the plaintiff was in a policy-making position). Importantly, the defendant bears the burden of proof on an asserted affirmative defense. *See Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001) (defendant employer in an employment discrimination action bears the burden of proof on an affirmative defense). Defendants do not argue otherwise, and the court's research reveals no caselaw placing the onus on a § 1983 plaintiff alleging employment discrimination based on political affiliation to plead facts demonstrating that the predicate employment position at issue is not a policy-making position. Accordingly, the onus is on Defendants to establish that the GBW Program Coordinator position for which Krause applied was a policy-making position, and the record before the court establishes Defendants have failed to meet their burden sufficient to warrant summary judgment.

In particular, the County Defendant relies in support of its argument that the Formula Grant Program Coordinator position for which Krause applied with WDC[14] is a

---

[14] Krause concedes that the newly created GBW Director position is a policy-making position. Accordingly, the court's discussion on this point does not include the GBW Director position.

policymaking position on the posted job description.[15]  County Defendants'

Memorandum Supporting Summary Judgment at 9-10.  According to the County

Defendants, the posted job description describes the Program Coordinator's duties as

including managing, administering and overseeing the day to day operations of the

WTW program for Buffalo and Erie County and the WDC, and assuming responsibility

for the overall program performance, staff management and relations with local, state

and federal officials, community based organizations, the business community and

various boards.  *Id*.  The Program Coordinator position requires technical expertise and

demonstrated knowledge of the concepts and tenets of the welfare-to-work initiative,

and is not a civil service position.  *Id*. at 10.  Finally, the County Defendants' maintain

that the position is "confidential or policymaking in nature."  *Id*.

Although the County Defendants' description of the Program Coordinator

position's job duties, standing alone, may support a finding that the position qualifies as

a "policymaking" position that is exempt from constitutional protection, the evidence

Krause submits in opposition to summary judgment establishes sufficient issues of fact

as to the accuracy of such description.

In particular, the posted job description for the Program Coordinator position

Krause held as a PIC employee is identical to the posted job description for the

Program Coordinator position for which Krause applied to be hired by WDC and for

which Marconi was hired, except that references to "PIC" have been replaced with

---

[15] A copy of the job description posted for the Program Coordinator position with WDC is
submitted as County Defendants' Exh. H and Plaintiff's Exh. KK.

"WDC" and the salary, rather than being given as a range for the PIC position, is simply stated as "negotiable" for the WDC position.  Compare Plaintiff's Exh. A with Plaintiff's Exh. KK.  Krause's description of the Program Coordinator position she held as a PIC employee varies substantially from that described by the County Defendants.  In particular, although Krause does not dispute that the position was not a civil service position, or that it required technical expertise and demonstrated knowledge of the concepts and tenets of the welfare-to-work initiative, Krause maintains that Bratek, Kaczmarek and Sferlazza were the "three top policy makers at PIC who were responsible for the welfare-to-work program."  Krause Affidavit Opposing Summary Judgment ¶ 8.

Specifically, Bratek was responsible for all hiring and firing of personnel, including screening resumés and job applications, selecting the applicants to be interviewed, and participated in the interviews.  Krause Affidavit Opposing Summary Judgment ¶ 5.  Although Krause sometimes conducted interviews, she was permitted only to make recommendations to Bratek and was not authorized to hire. *Id*.

Further, according to Krause, Kaczmarek, PIC's Director of Planning, was responsible for designing the Welfare-to-Work program and also supervised Krause on a daily basis.  Krause Affidavit Opposing Summary Judgment ¶ 6.  Kaczmarek was present at all meetings with Erie County policymakers[16] and her department was responsible for contracting with agencies. *Id*.  Kaczmarek, rather than Krause, was

---

[16] Krause does not identify the Erie County policymakers.

responsible for reporting any changes to the WTW program to the PIC Board of Directors. *Id*. Additionally, Sferlazza was the "point person" on financial, budget lines and accounting procedures. *Id*. ¶ 7.

Pursuant to the directives of Bratek and Kaczmarek, the WTW Coordinators were not permitted to direct staff members to contact a company regarding the hiring of a WTW client without "clearing it through" PIC's Director of Marketing Bagen. Krause Affidavit Opposing Summary Judgment ¶ 8. Bagen was also responsible for all press releases related to the WTW program. *Id*.

Significantly, Defendants submit nothing challenging any of Krause's assertions on this issue. Nor do Defendants submit an affidavit from Marconi verifying that the Program Coordinator position, as held by Marconi, performs the type of functions necessary to be considered a "policymaking" position. Moreover, McDermott's assertion, McDermott Affidavit ¶ 22, that "[f]rom an operational point of view, I saw no changes in GBW after the transition from PIC to WDC," supports a finding that the Program Coordinator position, as occupied by Marconi, was not charged with additional responsibilities sufficient to transform it from a non-policymaking position, as Krause maintains, to a policymaking position, as County Defendants argue.

According, sufficient fact issues exist such that Defendants' motions for summary judgment should, on this issue, be DENIED.

      **D.**   **Qualified Immunity**

The County Defendants seek summary judgment, asserting they are protected from litigating the instant action by the doctrine of qualified immunity.  County Defendants' Memorandum Supporting Summary Judgment at 10.  According to the County Defendants, qualified immunity "insulates government employees from suit for actions taken in their official capacity," thereby "relieving officials of individual liability [so as to] encourage[ ] people to pursue careers in the public sector, and also allows officials to pursue their duties in the most vigorous manner possible." *Id*.  The County Defendants further maintain that no unconstitutional actions on the part of either Giambra or Calabrese have been alleged, the record fails to establish any personal involvement by either Giambra or Calabrese as to Krause, both Giambra and Calabrese acted in good faith in light of clearly established law, and Giambra and Calabrese's actions were objectively reasonable under the circumstances. *Id*. at 11.

The doctrine of qualified immunity "shields a government official acting in an official capacity from suit for damages under § 1983 unless the official 'violated clearly established rights of which an objectively reasonable official would have known.'" *Blouin v. Spitzer*, 356 F.3d 348, 359 (2d Cir. 2004) (quoting *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003)).  "The determination generally involves a two-step inquiry: do the facts alleged show the officer's conduct violated a constitutional right, and, if so, was the right in question clearly established?" *Blouin, supra* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Here, the record before the court fails to establish that

qualified immunity shields Giambra and Calabrese from the instant litigation.

In particular, the facts, as alleged in the Complaint and viewed in the light most favorable to Krause as required on summary judgment, *Rattner*, *supra*, 930 F.2d at 209), assert that the County Defendants violated Krause's First Amendment right to free association with a political party by creating and maintaining a policy whereby members of the Democratic political party were passed over for certain employment positions with Erie County's federally funded job training and employment programs in favor of members of the Republican and Conservative political parties, some of whom did not possess the basic education and job experience for the respective position. Complaint ¶¶ 14, 28, 33. Moreover, at the time of the alleged constitutional violations during the Summer and Fall of 2000, Krause's First Amendment right to freely associate with the political party of her choosing was clearly established. *Camacho*, *supra*, 317 F.3d at 160 ("Affiliating oneself with a political party or faction is [ ] protected by the First Amendment.").

On this record, a reasonably jury could agree with Krause's allegations that Giambra and Calabrese created and maintained a policy to replace Democrats previously employed by PIC with new hires who were members of political parties supportive of Giambra's political aspirations, or friends and relatives of Giambra. The jury could further find that Giambra and Calabrese could not have objectively believed that by creating and maintaining such a policy, they were not violating Krause's First Amendment right to freely affiliate with the political party of her choice.

Accordingly, the summary judgment motions, insofar as they assert the defense of qualified immunity, should be DENIED.

E.   **Punitive Damages**

Finally, the County Defendants seek summary judgment on the issue of punitive damages, arguing that punitive damages are not recoverable against Defendants Giambra or Calabrese insofar as they are sued in their official capacity.  County Defendants' Memorandum Supporting Summary Judgment at 11.  The County Defendants also reference the Complaint as establishing that Giambra and Calabrese are sued only in their official capacity. *Id*. (citing Complaint ¶¶ 7, 8 and Caption). Krause does not argue otherwise.

It is settled that punitive damages cannot be recovered from a municipal entity or municipal employees sued in their official capacity.  *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 262 (2d Cir.), *cert. denied*, 520 U.S. 1211 (1997) (holding defendant municipal officers, sued only in their official capacity, enjoyed the same immunity from punitive damages as did the defendant municipality).  Krause does not argue otherwise.  Furthermore, the Complaint states claims against Defendants Giambra and Calabrese only in their official capacity.  *See* Complaint ¶¶ 7 and 8.

Accordingly, the County Defendants' motion for summary judgment should be GRANTED insofar as Krause seeks punitive damages against Defendants Giambra and Calabrese, who are sued only in their official capacities.

## **CONCLUSION**

Based on the following, the County Defendants' motion (Doc. No. 20) to join in

the Workforce Defendants' motion for judgment on the pleadings is GRANTED; the

Workforce Defendants' motion (Doc. No.13) to dismiss the Complaint as time-barred

should be DENIED; the motions to strike filed by the County Defendants (Doc. No. 46)

and the Workforce Defendants (Doc. No. 47), are DENIED, the motion for summary

judgment filed by the Workforce Defendants (Doc. No. 30) should be DENIED; and the

motion for summary judgment filed by the County Defendants (Doc. No. 34) should be

DENIED in part and GRANTED in part.

SO ORDERED,
as to County Defendants' motion to join
in the Workforce Defendants' motion for
judgment on the pleadings, and as to the
County Defendants' and the Workforce
Defendants' motions to strike,


_____/s/ *Leslie G. Foschio*
_____
            LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


                              Respectfully submitted,
                              as to the motion to dismiss the Complaint as
                              time-barred, and as to the County Defendants'
                              and the Workforce Defendants' motions for
                              summary judgment,

                                /s/ *Leslie G. Foschio*
                              _____
                                  LESLIE G. FOSCHIO
                              UNITED STATES MAGISTRATE JUDGE


DATED:      September 29, 2005
            Buffalo, New York

73

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      September 29, 2005
            Buffalo, New York

74